**In the Matter of Dennis Edward DOUD, Cheryl A. Doud, Engaged in Farming, Debtors.**

**Bankruptcy No. 86–3396–C.**

United States Bankruptcy Court, S.D. Iowa.

June 10, 1987.

Jerrold Wanek, Des Moines, Iowa, for debtors.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for FmHA.

Elizabeth A. Nelson, Des Moines, Iowa, trustee.

## ORDER ON OBJECTION TO PLAN

LEE M. JACKWIG, Bankruptcy Judge.

On March 24, 1987 a confirmation hearing concerning the debtors' Chapter 12 plan was held before this court. The Farmers Home Administration (FmHA) objected to the 6.5% discount rate the debtors propose to apply to the FmHA's allowed secured claim. Jerrold Wanek appeared on behalf of the debtors and Linda R. Reade, Assistant U.S. Attorney, appeared on behalf of the FmHA. Briefs concerning the discount rate issue were filed on April 22, 1987 at which time the matter was considered fully submitted.

The FmHA argues that the discount rate should equal the contract rate plus a "coercion rate" of 10%. The debtors assert the appropriate rate is the treasury bill rate plus a 1% risk factor which equalled 6.5% (5.5% treasury bill rate plus 1%) at the time of the hearing. For the reasons set forth below, the discount rate which will be utilized in Chapter 12 cases involving conventional lenders and entailing no unusual circumstances will be calculated at the treasury *bond* yield with a remaining maturity matched to the average amount outstanding during the repayment period of the allowed claim plus 2% to account for risk. However, because of the unusual nature of three of the four loans involved in this case, the contract rate will be applied to those particular loans.

### FACTUAL BACKGROUND

The parties have stipulated that the FmHA's claims arise out of four promissory notes executed by the debtors and held by the FmHA. The nature of the notes is summarized as follows:

| Date of Note | Interest Rate | % of Debt | Type of Loan |
|---|---|---|---|
| 04/07/78 | 3% | 4% | Emergency |
| 11/13/78 | 8½% | 16% | Emergency |
| 11/13/78 | 8½% | 24% | Soil & Water |
| 06/12/80 | 5% | 56% | Limited Resource Farm Ownership |

The debtors' Chapter 12 plan of reorganization calls for an annual payment to the FmHA based on a 15–year amortization at an interest rate of 6.5 percent. The FmHA's allowed claim under the plan is $95,958.72.

## DISCUSSION

### I.

11 U.S.C. section 1225(a)(5)(B) provides that a court shall confirm a plan over the objection of a secured creditor if the creditor will retain the lien securing its claim and will receive value, as of the effective date of the plan, that is not less than the allowed amount of the creditor's claim. In short, this provision entitles a creditor to the present value of its property to be distributed under the plan. *Colliers* defines present value as "a term of art for an almost self-evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence." 5 *Colliers on Bankruptcy* ¶ 1129.03, at 1129–62 (15th ed. 1986). One court has described the computation of present value in the context of a Chapter 13 case by stating:

> To compute the "present value" of a creditor's secured claim in a Chapter 13 proceeding requires the court to determine what the present worth is of a proposed stream of fixed payments over the life of the plan, and to accomplish this task, the payments are "discounted" to determine their present value; as a practical matter, the court is in effect computing an interest rate to be applied to the amount of the creditor's allowed secured claim.

*In re Klein*, 10 B.R. 657, 661 (C.D.N.Y. 1981) (citations omitted).

This court has found no cases to date concerning the discount rate to be applied in Chapter 12 cases. However, the language in section 1225(a)(5)(B) is identical to the language of section 1325(a)(5)(B) which deals with present value in Chapter 13 cases. Therefore, cases interpreting present value in a Chapter 13 case are useful analogues in interpreting section 1225(a)(5)(B). This conclusion is bolstered by the legislative history of Chapter 12 which reveals that the new chapter has been patterned to a large extent after Chapter 13. 132 Cong.Rec. S 15076 (daily ed. Oct. 3, 1986) (statement of Sen. Grassley).

The methods by which the courts have calculated the discount rate are varied. As delineated in the case of *In re Mitchell*, 39 B.R. 696, 700 (Bankr.D.Oregon 1984), the various rates that courts have utilized include: (1) the contract rate, (2) the legal rate, (3) the rate determined under 26 U.S.C. section 6621 of the Internal Revenue Code, (4) the treasury bill rate, and (5) the treasury bill rate with adjustments made for risk.

■ The FmHA argues that the Eighth Circuit decisions of *United States v. Neal Pharmacal Company*, 789 F.2d 1283 (8th Cir.1986) and *In re Monnier Bros.*, 755 F.2d 1336 (8th Cir.1985) set out the correct standard for determining the appropriate discount rate. Both cases approved the "market rate" approach. The court in *Monnier* stated:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*Monnier* 755 F.2d at 1339, quoting 5 *Collier on Bankruptcy* ¶ 1129, at 1129–65. Although *Monnier* and *Neal Pharmacal* involved Chapter 11 reorganizations, there is no reason to except Chapter 12 reorganizations from the market standard. Having determined that the market rate is the appropriate rate, a more difficult question is presented—what interest rate best represents the market rate?

■ In analyzing present value in a Chapter 13 case, the court in *In re Fisher*, 29 B.R. 542, 543 (Bankr.Kan.1983) noted that a discount rate is comprised of a "riskless" rate, which is usually commensurate with the interest paid on government bonds and bills (generally not considered subject to default), and a risk component. The debtors argue that the appropriate discount rate should be based on the treasury bill rate. Noting that the short term nature of this investment best reflects changes in the economy, the court in *Fisher* concluded that the treasury bill rate is the best indicator of the risk free rate of interest. *Fisher* at 543.

This court finds the yield on treasury bonds to be the preferable riskless rate for the reason that the yields on treasury bond rates are reported on a variety of maturity dates which permits accurate matching of the rate with the repayment periods in a Chapter 12 plan. Treasury bills are short-term investments with a maximum maturity of fifty-two weeks. Yields on treasury bonds are reported on maturities that extend from one to thirty years. Given that most plans amortize some debt over a period of years, the treasury bond rate can be matched to those longer term payout periods. Moreover, yields on treasury bonds are simple to find since they are reported by a number of sources. The yields are not subject to manipulation because they reflect national markets and are reported daily. Additionally, they are extremely current as the bonds are traded daily.

The difference between government securities and plan payments should be accounted for in choosing the maturity of the security. Carbiener, *Present Value in Bankruptcy: The Search For an Appro-* *priate Cramdown Discount Rate*, 32 S.D. L.Rev. 42, 64 (1986). Carbiener explains that:

> [t]he terms of a reorganization plan generally call for periodic principal payments plus interest. The terms of a government security, however, require the periodic payment of interest only, with the entire principal due at the end. This difference is significant because under a bankruptcy plan, the creditor has the use of some of its claim with the first payment, and this amount increases throughout the plan payment period. With a government security, however, the creditor (purchaser) is deprived of the use of its money for the entire period of the loan. Because a government security holder must wait longer than a bankruptcy creditor before recovering any principal, the rate on a government security of a duration equal to the plan's payment period will have a higher premium than is required under a bankruptcy plan.

*Id.* To reconcile this difference, Carbiener suggests calculating the percentage of the average amount outstanding during the repayment period and then matching the percentage to a government security with an equal maturity. For example, in a case where $10,000.00 debt is proposed to be paid over 10 years with yearly payments, the average outstanding indebtedness is $5,500.00.[1] Stated as a percentage, 55% of the claim is outstanding over the payment period.[2] Since the creditor in this hypothetical proposes to use a ten-year repayment term, the discount rate will be based on a government security with a duration of 55% of ten years or, in other words, 5.5 years.

---

**1.** The remaining outstanding balance is calculated by summing the principal amounts owed during each payment period and dividing that sum by the number of periods. For example in the hypothetical, the amount outstanding during the first payment period (1 year intervals) would be $10,000.00 assuming the first yearly payment of $1,000.00 was not due until a year after confirmation. Once the $1,000.00 payment was made, only $9,000.00 would remain to be paid. A year later assuming the $1,000.00 payment was made, only $8,000.00 would be owing and so on. Addition of the amounts outstanding over a 10 year period equals $55,000.00 ($10,000.00 + $9,000.00 + $8,000.00 + $7,000.00 + $6,000.00 + $5,000.00 + $4,000.00 + $3,000.00 + $2,000.00 + $1,000.00 = $55,000.00). $55,000.00 ÷ the sum of the periods (10 years) = $5,500.00.

**2.**

$$\frac{5,500}{10,000} = .55$$

Since a treasury bond is considered a "risk free" investment, it represents the "riskless" component of the discount rate. A risk factor must be ascertained to complete the discount rate formula. The *Fisher* court exhaustively examined the costs and risks that are factored into interest rates charged to borrowers outside of bankruptcy. *Fisher*, 29 B.R. at 543–546. These expenses include collection costs for locating the debtor, dunning or billing, obtaining a judgment and executing upon the judgment. Interest rates also reflect the creditor's administrative costs, profit margin and risk of collateral depreciation. The *Fisher* court went on to find that many of these risks are reduced or eliminated in a Chapter 13 case. The court noted that collection costs are eliminated and administrative costs are greatly reduced because many administrative functions are handled by the Chapter 13 trustee. Also, risk is reduced because a confirmed plan presumes repayment under the feasibility finding. Moreover, the *Fisher* court found that the element of profit is inappropriate in a Chapter 13 context. *Fisher* at 546, *see, also, In re Corliss,* 43 B.R. 176, 179 (Bankr.D.Oregon 1984).

Some of the same elements that reduce or eliminate risk in Chapter 13 cases are at work in Chapter 12 cases. The Chapter 12 trustee is charged with overseeing the affairs of the debtor thereby reducing the administrative and collection costs. *See generally* 11 U.S.C. section 1202. Like Chapter 13, Chapter 12 requires that the court must make a feasibility determination. *See* 11 U.S.C. section 1225(a)(6). Chapter 12 creditors therefore are afforded a statutory presumption (albeit less sound in reality, as discussed below) of repayment upon confirmation. Also, application of a proper discount rate in a Chapter 12 setting should not focus on any profit factor for creditors.

Notwithstanding the elements that tend to reduce risk, Chapter 12 reorganizations have aspects that heighten risk. Arguably the greatest source of risk is the unpredictable nature of the agricultural economy itself. Though a plan must meet the feasibility requirements of 11 U.S.C. section 1225(a)(6), the court is keenly aware that the assumptions contained in the plan and otherwise found reasonable at the time of confirmation are subject to the vicissitudes of the farm economy. Prices relied upon in February may not be the prices paid in November. Yields anticipated in the spring may not be the yields harvested in the fall. The numerous variables affecting commodity prices—the value of the dollar, the weather, foreign production, interest rates, government policy—make predictions challenging for even the most enlightened.

The severity of the agricultural depression also increases risk to creditors. Even with price supports, many farm debtors are finding it exceedingly difficult to service debt. Those who do so typically realize thin profit margins which leave little room for error. The court takes judicial notice that the market prices for soybeans and corn are below the break-even price.[3]

Finally, this court notes that should a plan fail and the case be dismissed, the creditors will incur collection costs that normally are not incurred with nonagricultural debtors. For instance, in Iowa, a creditor must participate in mandatory mediation before enforcing a security interest in agricultural property. Act of May 29, 1986, sections 12–30, 1986 Iowa Legis. Serv.No. 7 at 27–33 (West) (to be codified at Iowa Code Chapter 654A).

Weighing the positive and negative factors just discussed, the court finds that a 2% upward adjustment adequately compensates a conventional lender for the overall risk associated with a Chapter 12 reorganization. Thus, in Chapter 12 cases, a yield on a treasury bond with a remaining maturity matched to the average amount

---

**3.** The Iowa State Extension Service reports that the estimated 1987 production costs for corn (corn following corn) and soybeans are $2.53/bu. and $5.23/bu. respectively. M. Duffy, *Estimated Costs of Crop Production in Iowa—1987,* Iowa State Cooperative Extension Service Publication, p. 8 (Dec.1986). Market prices as of April 29, 1987 were $1.58/bu. for corn (No. 2 yellow) and $5.03/bu. for beans (No. 1 yellow). Des Moines Register, Apr. 30, 1987 at 9S, col. 5.

outstanding during the term of the allowed claim plus a 2% upward adjustment to account for risk best estimates the prevailing market discount rate.

## II.

The instant case presents unusual circumstances that justify departing from the aforementioned calculation in determining the discount rate for three of the debtors' four loans with the FmHA. The three loans in question are dated April 7, 1978, November 13, 1978 (soil and water) and June 12, 1980 and bear an interest rate of 3%, 8½% and 5%, respectively. The special nature of these three loans requires that the contract rates be left intact.

■ Treatment of the FmHA loans must be viewed in light of the agency's mission to provide credit to family farmers who are unable to obtain credit from conventional sources. *Curry v. Block,* 541 F.Supp. 506, 511 (S.D.Georgia), *aff'd Curry v. Block,* 738 F.2d 1556 (11th Cir.1984). The FmHA lending programs have been characterized as forms of social welfare in that the purpose of the programs is to assist the underprivileged farmer. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 735, 99 S.Ct. 1448, 1462, 59 L.Ed.2d 711 (1979); *Curry,* 541 F.Supp. at 511.

In furtherance of the FmHA's goal to assist disadvantaged farmers, the interest charged on FmHA insured loans is generally the government's cost of money. 7 U.S.C. section 1927(a)(2) (farm ownership and soil and water loans);[4] 7 U.S.C. section 1946(a)(1) (operating loans). For low equity or beginning farmers, lower interest loans are available under the limited resource program.[5] Limited resource interest rates on farm ownership loans may not be set at a rate in excess of one-half of the

current average market yield on marketable United States obligations nor less than 5% per year. 7 U.S.C. section 1927(a)(3)(B). Interest rates charged on emergency disaster loans in 1978 (the year in which the debtors borrowed emergency loan funds from the FmHA) could not exceed 5% on loans up to the amount of the actual loss. 7 U.S.C. section 1964(b)(1) (1978). For loans in excess of the actual loss, interest was charged at commercial rates. 7 U.S.C. section 1964(b)(2) (1978).

■ Three of the debtors' four notes with the FmHA are at interest rates at or below the government's cost of money. One of the notes bears a commercial rate. The note dated April 4, 1978 concerns an emergency loan at 3% interest. Obviously this low rate indicates a government subsidy. The note dated November 13, 1978 also involves an emergency loan, however the interest charged is 8½%. As noted above, the law in effect in 1978 provided for loans not to exceed 5% interest for actual disaster losses. 7 U.S.C. section 1964(b)(1) (1978). However for loans in excess of actual losses, the interest rate charged was the commercial rate. 7 U.S.C. section 1964(b)(2) (1978). Since the 8½% rate charged on the loan exceeds the 5% limit for actual losses, the court concludes the 8½% rate reflects the commercial rates being charged at the time.

The debtors borrowed funds under the soil and water program on November 11, 1978. Pursuant to 7 U.S.C. section 1927(a)(2) (1987), the interest rate to be charged on such a loan is not to exceed the government's cost of money plus 1% as determined by the Secretary of Agriculture. The 8½% charged to the debtors thus represents the government's cost at the

---

**4.** Provisions governing FmHA farm loan programs are found under the Consolidated Farm and Redevelopment Act (CFRDA), 7 U.S.C. section 1921 *et seq.* (1986).

**5.** Farmers applying for limited resource assistance must show among other things:
1) that they are owners or operators of small or family farms;
2) that they are farmers or ranchers with a low income; and

3) that they must maximize their income from farming or ranching operations.
7 U.S.C. section 1934(a). Additionally, applicants for the program must face such problems as under-developed managerial ability and limited education and must show that a reasonable standard of living could not be obtained without the low-interest limited resource loan rate. 7 C.F.R. sections 1941.4(g) and 1943.4(g).

time. On June 6, 1980, the debtors borrowed under the farm ownership, limited resource program. The 5% interest charged comports with the 5% limit under 7 U.S.C. section 1927(a)(3)(B). This low rate also indicates a heavy government subsidy.

With the exception of the emergency loan dated November 13, 1978, the interest rates charged to the debtor were at or below the government's cost of money. As discussed in Part I of this order, the interest rate paid on government obligations (the government's cost of money) is considered the "riskless" component of a discount rate. Hence, the interest paid by FmHA borrowers does not contain a risk element. Nor does the interest rate reflect any of the other factors that make up commercial interest rates—factors such as profit, administrative costs, costs of collection. In essence, these risk costs are borne by the taxpayers in furtherance of a legislative initiative to nurture small, low-equity farming enterprises.

By applying a discount rate calculated in a manner described in Part I to the three loans bearing non-commercial interest rates, the policies underlying the FmHA loan programs will be thwarted. At the present time, yields on treasury bonds adjusted for the average amount outstanding of the FmHA's allowed claim and a 2% risk factor is 10.86%.[6] Application of this rate to the debtors' FmHA debt would result in raising the 3%, 5%, and 8½% interest rates on the loans as written to 10.86%. In effect, the debtors by seeking a Chapter 12 reorganization would be deprived of one of the most important devices the FmHA has at its disposal to assist farmers—low interest rates. It would be incongruous indeed if a farmer who on one hand qualified for FmHA protections because of high risk characteristics[7] would on the other hand be required to forego these protections in order to proceed under Chapter 12. Accordingly, the discount rate to be applied on the notes dated April 7, 1978, November 13, 1978 (soil and water) and June 12, 1980 will be the respective contract rate. The yield on a treasury bond with a remaining maturity matched to the average amount outstanding during the term of the allowed claim plus a 2% adjustment to account for risk will be applied to the November 13, 1978 emergency loan because the interest charged on the note was determined by using a commercial rate.

It should be noted that the court has little difficulty in reconciling these conclusions with those reached in *Neal Pharmacal* and *Monnier, supra*. First, neither case dealt with FmHA loans. This fact is critical in that the three FmHA loans in question involve interest rates that do not reflect the risks and costs reflected in commercial rates. The fact that the debtors have borrowed under loan programs designed to provide farming opportunities to low equity farmers at congressionally-mandated low interest rates obviates the need for calculating a discount rate using a market rate approach.

Secondly, the court in *Neal Pharmacal* points out the importance of determining the discount rate on a case by case basis. *Neal Pharmacal*, 789 F.2d at 1289. The circumstances surrounding this case—the

---

6. The average amount outstanding on the FmHA allowed claim during the 15 year payment period is $51,177.97 per year. This figure stated as a percentage of the $95,958.72 allowed claim is 53%. 53% of the 15 year repayment period is approximately 8 years. As of May 21, 1987, yield on a treasury bond with an 8 year maturity was 8.86%. Wall Street Journal, May 21, 1987 at 35, col. 2. Addition of a 2% risk factor yields 10.86%. In calculating the average amount outstanding, it should be noted that the effect of a blended interest and principal amortization was not taken into consideration. In a typical amortization, the amount of principal paid in each payment period is not constant. For example, the amount of principal paid in the first payments is less than the amount of principal paid toward the end of the term of the loan. In calculating the average amount outstanding on the FmHA's allowed claim, it was assumed principal payments would be constant over the 15 year term. The difference in resultant discount rate between using a constant principal payment calculation and using a calculation that reflects a principal-interest amortization is negligible.

7. FmHA borrowers generally are high risk borrowers in that a requisite for FmHA assistance is the inability to obtain conventional credit. 7 U.S.C. sections 1922(a)(4), 1941(a)(4).

special programs from which the debtors borrowed, the low interest rates, the fact that risk is borne by the taxpayers—lead the court to conclude that the contract rate for the three loans is the appropriate discount rate.

As a final matter, the court is cognizant of what might appear to be a conflict between the provisions governing the interest rates to be applied to FmHA loans and the "present value" provisions of section 1225(a)(5)(B). However, the court is mindful of the rule of statutory construction that conflicting statutes should be read as harmoniously as possible so that each is given effect. *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Moreover, this court's treatment of the FmHA loans gives effect to both statutes. Present value standards are realized. Indeed, the interest rate provisions required under CFRDA are left intact at the so called "contract rate" to the extent the interest rates reflect the government's cost of money or a subsidized rate. Calculation of the discount rate for the FmHA loan bearing a commercial interest rate is subject to the "market rate" approach.

CONCLUSION AND ORDER

WHEREFORE, based on the foregoing analysis, the emergency loan dated November 13, 1978 will bear a market discount rate calculated in a manner consistent with Part I of this opinion. With respect to the other FmHA loans, the discount rate shall be the contract rate of interest.

THEREFORE, the FmHA's objection to the plan is sustained to the extent the debtors' proposed discount rate is less than the rates calculated in the aforementioned manner.

The debtors are directed to file an amended plan which comports with this order within 30 days.