In re Clarence C. and Katy
HARDZOG, Debtors.

Bankruptcy No. BK–86–3552–A.

United States Bankruptcy Court,
W.D. Oklahoma.

Sept. 11, 1987.

B.J. Brockett of Brockett, Warren, Brady & Homsey, Oklahoma City, Okl., for debtors.

G. Blaine Schwabe, III and J. Eric Ivester of Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, Okl., for the Federal Land Bank of Wichita.

Rick Poland of Rogers Abbott & Associates, Oklahoma City, Okl., for Jack Cornelius, Trustee.

## MEMORANDUM OF DECISION AND ORDER

RICHARD L. BOHANON, Chief Judge.

The Federal Land Bank of Wichita is an oversecured creditor and debtors propose to pay the value of its claim over a 15 year period. This court previously determined that the discount factor to be paid FLB pursuant to 11 U.S.C. § 1225(a)(5)(B)(ii) is to equal its cost to obtain replacement funds for a term equal to that proposed in the plan plus a reasonable risk factor. *In re Hardzog*, 74 B.R. 701 (Bankr.W.D.Okl. 1987). Testimony and arguments regarding the cost of funds and risk factor now have been heard.

The testimony indicates that FLB raises funds in two ways. First, it receives proceeds from bonds issued by the Federal Farm Credit Banks Funding Corporation. Second, it issues private stock to borrowers in lieu of 5% of the amount of each loan.

A financial expert testified regarding the cost to obtain funds by issuing 15 year bonds.

This testimony shows that the actual cost of funds consists of several components. They are: 1) the interest rate paid on 15 year government bonds which is currently 8.94%; 2) a premium of .75% to compensate for risk associated with the fact that the FLB bonds are not guaranteed by the United States and are farm industry bonds; 3) bond underwriting expenses which total .10%; and 4) the net cost of delivery to a borrower, including operating expenses and other overhead expenses totaling .531%.

The court finds this testimony to be credible and no other evidence concerning the actual cost has been offered. Thus, the court accepts these rates as accurate. However, we do not believe that all these components are properly allowable as part of the cost of funds.

The nature of the cost of delivery is different than interest costs on bonds and the cost of issuing those bonds. The cost of delivery represents expenses incurred after the funds have been obtained in the effort to market those funds to a borrower. Consequently, those expenses represent a portion of the market rate rather than the cost to obtain the funds. Since we have held that only the cost to obtain the funds may be recovered from the debtor, the cost of delivery will not be allowed as a component of cost.

When a borrower receives loan proceeds from FLB only 95% of the principal amount of the loan is actually funded. The borrower receives FLB stock with a face value equal to the amount of principal not received. Over the term of the loan the borrower receives dividends on the stock, providing FLB is profitable. Once the loan is fully repaid the borrower can return the stock and receive payment equal to its face value.

As a result of this arrangement FLB is able to raise 5% of its money at only the cost of dividends paid on the stock. FLB is

not now returning a profit and no dividends are presently paid. Thus, FLB raises 5% of its funds at no cost.

The court determines that FLB raises 95 percent of its funds at a cost of 9.79%[1] and 5 percent of its funds at no cost. The net allowable cost of funds is 9.3%.[2]

The court must now determine an appropriate risk factor. Perceived risk due to farm loans in general has already been considered in determining the cost of funds. The risk now considered is the risk to this lender in lending to these particular borrowers.

FLB's expert witness has estimated the average risk of default experienced by FLB over a four year period to be approximately 2% of the loan base. The court accepts this rate as FLB's average portfolio risk.

The average portfolio risk may be adjusted to reflect the risk associated with these particular borrowers. FLB urges that the risk is higher than average for several reasons: 1) the value of the real estate collateral has been decreasing; 2) the debtors will be operating a new business;[3] 3) as interest accrues[4] and the land value decreases the total claim will exceed the value of the property but if FLB were able to take and sell the property today it would be paid in full; and 4) this is a coerced loan at 100% of value while FLB's loan policy is to limit loans to 80% of the value of the property.

The rationale of a coerced loan is usually presented as a basis to allow the contract rate. *In the Matter of Cooper*, 11 B.R. 391 (Bankr.N.D.Ga.1981). This court has al-ready rejected the contract rate and to that extent FLB's argument is misplaced. It is also noted that FLB's claim is approximately 87% of the value of the property.[5] Thus, it is not a 100% loan.

At least one other court has considered the issues involved in setting the risk factor. In *In re Fisher*, 29 B.R. 542 (Bankr.D.Kan.1983) a creditor argued that a debtor represents a greater risk than average. The court rejected that proposal by finding that a debtor actually represents a lower risk than average.

The court identified three elements of risk: 1) duration of the loan; 2) type of collateral involved; and 3) the risk of default.

The risk of default by a debtor was considered to be lower than other borrowers because through the plan confirmation process the debtor has voluntarily submitted to the court, the court has ruled on feasibility, the court has considered debtor's willingness and ability to comply with the plan, unsecured debt has been reduced, and the debtor has been placed on a supervised budget. *In re Fisher*, 29 B.R. at 544. This court finds *Fisher* persuasive while being aware that another court has recently concluded that debtors represent a higher risk. *In the Matter of Doud*, 74 B.R. 865 (Bankr. S.D.Iowa 1987).[6]

To lower the risk to creditors the plan already provides that it will automatically terminate in the event a payment is not made. In order that risk may be minimized further or eliminated, this court will confirm the plan only if it provides that the

---

**1.** 8.94% (government bond rate) + .75% (perceived farm industry risk) + .10 (underwriting expenses) = 9.79%.

**2.** (.95 × 9.79%) + (.05 × 0%) = 9.301%.

**3.** Debtors will continue to farm but will also be involved in a trucking operation.

**4.** The first payment to FLB is due about one year after the plan is confirmed during which time interest will accrue.

**5.** $225,913 (amount of FLB's claim as of the confirmation date) divided by $258,900 (value of collateral as determined at the confirmation hearing) = 87.26%.

**6.** The *Doud* court determined that certain aspects of Chapter 12 reorganizations heighten the risk to the lender. These aspects included the unpredictable nature of the agricultural economy and the severity of the agricultural depression. *In re Doud*, 74 B.R. 865, 16 B.C.D. at 3. This court believes that these risks are reflected in the premium paid on farm industry bonds. This risk has already been included in the calculations here.

The *Doud* court also considered the risk that a lender may incur resulting from an Iowa state law which is not applicable here.

debtors deliver a deed in lieu of foreclosure to the trustee. The plan should include a provision directing the trustee to deliver the deed to FLB if the debtors do not cure a default within 15 days of a missed payment. This provision would eliminate the risk of any delay associated with a state court foreclosure suit.

The collateral involved is real estate. While FLB correctly points out that real estate in this geographic area has been depreciating recently, the plan arrangement here presents no more risk due to the type of collateral involved than the average real estate collateralized loan in FLB's portfolio. Further, risk generally due to farm real estate has already been considered in setting the cost of obtaining funds.

The amount of the FLB claim is approximately 87% of the value of the property. If in one year, when the first payment is due, the debtors do not make timely payment to FLB, FLB will recover the land with little additional expense. Further, the 12% cushion between the amount of the claim and value of the property will be adequate to pay accrued interest to that date and provides an allowance for depreciation of the property.

The plan provides for a 15–year amortization. The original loan was for a thirty year term. This case was filed after payments had been made for 12 or 13 years. Thus, FLB will receive full payment in a total of 27 or 28 years rather than 30 as originally contracted. A shorter term reduces the risk.

A creditor's expenses through the life of the plan are reduced because the trustee assumes the administration of collection and distribution of payments.

After considering the three elements of risk identified by the court in *Fisher*, this court concludes that the risk factor assigned to these debtors should be less than the average portfolio risk of this lender. In fact, considering the necessary plan modification and equity cushion, the court finds that FLB is assuming very little risk under this plan. However, there is always some risk in these situations that basic assumptions, such as appraisal values, will prove to be inaccurate or that some other unforeseen event or factor may affect the ability of the debtors to meet their plan obligations. Therefore, the risk factor is fixed at .7%.

Accordingly, the discount rate to be applied to the secured claim of FLB in this case is 10.0%.[7]

---

**7.** 9.3% (cost of funds) + .7% (risk factor) = 10.0%.