**In the Matter of Burr UNDERWOOD and Jessie Underwood, Debtors.**

**Bankruptcy No. BK87–650.**

United States Bankruptcy Court, D. Nebraska.

June 7, 1988.

Michael G. Helms of Schmid, Mooney & Frederick, P.C., Omaha, Neb., for debtors.

Jerrold L. Strasheim of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, Neb., for Alliance Nat. Bank & Trust Co.

George A. Sommer, Scottsbluff, Neb., for Burr and Clell Riesen.

## MEMORANDUM

JOHN C. MINAHAN, Jr.,
Bankruptcy Judge.

THIS MATTER is before the Court for consideration of confirmation of the debtors' proposed plan of reorganization under Chapter 12 of the Bankruptcy Code. Objections to the confirmation have been filed on behalf of Alliance National Bank & Trust Company (the "Bank") and Burr and Clell Riesen (the "Riesens"). An objection by the Federal Land Bank of Omaha has been settled. A trial on confirmation took place on January 8, 1988, and briefs have been submitted. For the reasons stated below, the plan is not confirmed.

The debtors, Burr and Jessie Underwood, are husband and wife. They filed a joint, voluntary petition under Chapter 12 of the United States Bankruptcy Code on March 5, 1987. Under the debtors' plan, the debtors may sell and dispose of the Bank's collateral and use the proceeds. The plan provides for installment payments to the Bank on its secured claim with interest payable at a discount rate calculated in

accordance with *In re Wichmann,* 77 B.R. 718 (Bkrtcy.D.Neb.1987). Four issues are presented for determination.

1. Does the plan violate 11 U.S.C. § 1225(a)(5)(B)(i), because the Bank will be deprived of its lien by the sale of its collateral and the use of its cash collateral?

2. Does the plan violate 11 U.S.C. § 1225(a)(5)(B)(ii) by providing for an interest rate on the Bank's secured claim which is too low?

3. Does the Bank have a valid mortgage on the debtors' real estate?

4. Is the plan feasible as required by 11 U.S.C. § 1225(a)(6)?

## FACTS

The debtors are ranchers. Their main source of income is a cow-calf operation on their 5,520 acre ranch. Before November 9, 1979, Burr Underwood, one of the debtors, inherited an undivided one-half interest in this ranch (the "inherited one-half interest"). Maxine Riesen inherited the other undivided one-half interest (the "Riesen one-half interest"). After November 9, 1979, the debtors purchased the Riesen one-half interest in the property under a land contract, which still has an unpaid balance. On December 6, 1985, the debtors gave the Bank a real estate mortgage on the entire ranch to secure all existing debt and future operating advances. Maxine Riesen's interest under the land contract is senior to the interest of the Bank under its mortgage. The value of the Riesen one-half interest is less than the amount owed to the Riesens under the land contract. Thus, the Riesens are undersecured creditors and the Bank cannot expect to realize any value from the Riesen one-half interest. The Bank also has a security interest in the debtors' equipment and livestock. According to the Bank's calculations, as of the trial date, it is slightly oversecured and about 55% of the Bank's secured claim is secured by cattle.

Based on historical evidence introduced by the Bank, the Court finds that there are periodic fluctuations in the price of cattle, both throughout the year, and from year to year. Over the past decade, the percentage difference between monthly highs and lows has ranged from 6% to 40%. The Bank requires substantial over-collateralization as a condition to the making of cattle loans. The Bank normally requires at least a 50% debt to asset ratio on loans secured by cattle.

The Bank's claim is evidenced by two promissory notes dated May 6, 1986. The contract interest rate under which the debtors obtained these funds from the Bank was 12.5%. The debtors' plan proposes to pay a 9.15% rate of interest on the Bank's claim. The 9.15% rate was calculated as of the date of filing the debtors' petition using the method described in *In re Wichmann, supra.* If the *Wichmann* discount rate had been calculated as of the confirmation hearing, a different rate would be determined.

Robert E. Knight testified on behalf of the Bank at trial. The Court finds that Mr. Knight is qualified by education (PH.D. in Economics from Harvard University) and experience (research officer and economist for Federal Reserve Board and Bank President) to give expert testimony regarding interest rates. Based on his testimony, the Court finds that the discount rate calculated pursuant to *Wichmann* is not the same as the interest rate normally charged on cattle loans by private lenders in arms-length transactions. Based on the testimony of Mr. Knight, the Court further finds that on short-term farm operating loans, lenders currently charge interest of between 13.75% and 15.75% per annum, and that on adequately secured cattle loans they charge 12.5% per annum.

There was no testimony on what interest rate a private lender would charge on a loan identical in all respects to the loan outstanding from the Bank to the debtor, which is to be repaid under the terms of the plan.

## DISCUSSION

### Retention of the Lien

■ The Bank objects to the following provision of the debtors' plan.

3.3 Secured claimants under this Plan shall retain their liens until the allowed secured claims have been satisfied as provided in this Plan. If, as to any specific secured claimant, the Debtors desire to use cash collateral, the Debtors shall be entitled to use such cash collateral if the Debtors maintain a minimum value in the remaining collateral secured to the creditor of at least 110% of the remaining balance due on the allowed secured claim. In the event Debtors use cash collateral, the Debtors shall file monthly reports of inventory and values and shall permit inspection by the secured creditor or the Trustee at any time upon reasonable notice. In addition, if the Debtors use cash collateral, any unsecured claim due the creditor shall not be discharged until the earlier of three years from the date of confirmation or payment in full of the allowed secured claim. Each creditor shall promptly release its lien upon any item of property where the claims secured by such property are satisfied as provided for in this Plan. In addition, if the Debtors desire to use cash collateral, any secured creditor requested to release its security interest in the cash collateral to be used, shall do so immediately by endorsing checks or drafts representing the cash collateral to be used upon presentation of a current monthly report of collateral remaining and values thereon showing that the Debtors have maintained a minimum value in the remaining collateral of at least 110% of the remaining balance of the claimant's allowed secured claim.

Under this provision, the debtors may sell the Bank's collateral and use the proceeds. The plan seeks to protect the Bank by providing that the equity cushion of the Bank will be maintained by the debtors at a minimum value of 110% of the remaining balance of Bank's claim. The Bank argues, first, that its claim is not presently 110% secured, and, second, the debtors' freedom to dispose of the Bank's collateral as if it were unencumbered, violates the requirement under 11 U.S.C. § 1225(a)(5)(B)(i) that the Bank retain its lien.

As was concluded by this Court in *In re Milleson*, 83 B.R. 696 (Bkrtcy.D.Neb.1988), a secured creditor does have a security interest in the equity cushion; 11 U.S.C. § 1225(a)(5)(B) requires that, as a condition to confirmation under that subsection, the holder of a secured claim shall retain its lien, including its lien in the equity cushion; and under § 363(e), a Chapter 12 plan may not deprive a secured creditor of its lien in collateral, including the equity cushion, unless the creditor's interest is adequately protected.

The relevant facts of this case are similar to the facts in *Milleson*. The debtors' proposal to maintain a 110% level of collateralization as a condition to the debtors' use of cash collateral is not sufficient assurance that the Bank's interest in the collateral will be adequately protected. Because the price of cattle is subject to wide fluctuation, the Court finds that the Bank's claim is likely to become undersecured during the repayment term of the Bank's secured claim under the plan. The evidence shows that the proposed plan is of marginal feasibility. It is probable that the debtors will default during the life of the plan. If such a default occurs, the plan is quite likely to deprive the Bank of its right to realize on the value of its collateral. Accordingly, paragraph 3.3 of the plan is impermissible under the circumstances and facts of this case because the interest of the Bank in its collateral is not adequately protected.

This decision and the Court's previous decision in *In re Milleson, supra,* should not be read as always precluding a debtor from using equity in collateral as a means of providing financing for its reorganization plan. Read literally, Section 1225(a)(5)(B)(i), which requires that a secured creditor retain its lien, would preclude reorganization when an oversecured creditor had a lien in all property of the estate since the collateral could not be sold and the debtor could not use its equity in the property to finance its reorganization. Such an interpretation would, however, be contrary to the basic principles and policies which the Bankruptcy Code seeks to carry out. Section 1225(a)(5)(B) must be read in

light of Section 363(1), which explicitly assumes that a Chapter 12 plan may propose to use or sell property. However, under Section 363 and the fifth amendment of the Constitution, a secured creditor's interest in property to be sold or disposed of under a plan may be entitled to be protected. The holder of a secured claim is entitled to maintain the economic status quo before and after confirmation of the plan to the extent of the value of its collateral. The value of collateral is at once the source and limit of the secured creditors' right to adequate protection. The interest in collateral to be protected is the creditors' right to realize on the value of its collateral in the event of default. The Bankruptcy Code, like the Bankruptcy Act, permits the "substitute of the ... indubitable equivalence" for the secured creditors protected property interest. *See In re Murel Holding Corp.*, 75 F.2d 941, 942 (2nd Cir.1935). "Such a substitute clearly must both compensate for present value and insure the safety of the principal." *In re American Mariner Industries, Inc.*, 734 F.2d 426, 433 (9th Cir.1984); *In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985) (quoting *American Mariner* with approval).

■ Whether and to what extent the creditors' interest in the equity cushion is entitled to protection depends upon the expected stability of the value of the collateral and the amount of the equity cushion. When the liquidation value of collateral will be stable during the repayment term, the interest of the secured creditor in the equity cushion is not entitled to protection because the eroding of the equity cushion will not impair the right to realize value from the collateral in an amount equal to the unpaid secured claim. However, if the liquidation value of the collateral is reasonably expected to drop to an amount less than the unpaid balance of the allowed secured claim during the repayment term under the plan, the secured creditor's equity cushion is entitled to adequate protection to the extent reasonably necessary to assure that upon default the secured creditor will realize collateral value in the amount of its unpaid secured claim. Section 1225 enumerates provisions for adequate protection applicable in Chapter 12 cases.

*Interest Rate*

■ Under the proposed plan, the Bank will be paid interest of 9.15% per annum on its secured claim. The Bank contends that the proposed interest rate is insufficient under 11 U.S.C. § 1225(a)(5), which provides that a plan cannot be confirmed unless:

with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder;

Under this subsection, if a secured creditor does not accept the plan and the plan does not provide for the surrender of the collateral to the secured creditor, the plan cannot be confirmed unless the secured creditor retains its lien and the present value of payments to be made to the secured creditor under the plan is not less than the amount of the secured claim. In order to determine whether the stream of future payments to the Bank has a present value equal to the amount of its secured claim, it is necessary to use a "discount rate." The Bankruptcy Code and its legislative history do not disclose or direct how courts are to select a discount rate to be used in Chapter 12 cases under 11 U.S.C. § 1225(a)(5). In Chapter 11 cases, § 1129 provides for the treatment of secured claims similar to the treatment of secured claims under § 1225(a)(5), but again, there is no legislative guide as to how the discount rate is to be selected under § 1129(b)(2).

In discussing the selection of an appropriate discount rate in Chapter 11 cases,

the Eighth Circuit Court of Appeals has consistently relied upon the following passage:

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the Court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*See In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985) (*quoting 5 Collier on Bankruptcy* ¶ 1129.03, 1129–65); *See also United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1285 (8th Cir.1986).

Citing *Neal Pharmacal, supra,* and *In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 651 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), the Ninth Circuit Court of Appeals noted that all circuit courts that had considered the meaning of § 1129(a)(9)(C) have agreed with the above quotation from *Collier on Bankruptcy. In re Camino Real Landscape Maint. Contractors,* 818 F.2d 1503, 1505 (9th Cir.1987). The Ninth Circuit then noted the glaring problem that "unanimity disappears upon application" of the rule to particular cases. *Id.*

Within the Eighth Circuit there is disparity in the way bankruptcy courts have applied the *Collier* formulation to particular cases. *See e.g.,* Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate,* 32 S.D.L.Rev. 42 (1987).

Because the treatment of secured claims in Chapter 11 cases under § 1129 is similar to the treatment of secured claims in Chapter 12 cases under § 1225, the Eighth Circuit Court of Appeals' decisions dealing with the selection of the discount rate under § 1129 should be applied to the Nebraska cases requiring selection of a discount rate under § 1225. The Eighth Circuit decisions are *In re Monnier Bros., supra,* and *United States v. Neal Pharmacal Co., supra.*

Within the Eighth Circuit there is disparity in the approach taken by bankruptcy courts in selecting the discount rate. Courts in Iowa, Nebraska and Missouri generally follow the approach set forth by Judge Jackwig in *In re Doud,* 74 B.R. 865 (Bkrtcy.S.D.Iowa 1987). In *Doud* the court concluded that the discount rate in a Chapter 12 case would be determined by adding two percent to the yield on a treasury bond with a remaining maturity comparable to the repayment term under the reorganization plan. *Id.* at 869 and 870. The two percent upwards adjustment is made to take into account risks under the reorganization. *Id.* In *Doud* the court contemplates that this method would not be followed in unusual circumstances. *Id.* at 870. *Doud* has been followed in a number of states. *See In re Bartlesmeyer,* 78 B.R. 975 (Bkrtcy.W.D.Mo.1987); *In re Noe,* 76 B.R. 675 (Bkrtcy.N.D.Iowa 1987); *In re Wichmann, supra.*

In contrast, bankruptcy courts in North Dakota and Minnesota have used approaches which involve more of a case-by-case analysis. *Doud* was rejected in North Dakota. *See In re Claeys,* 81 B.R. 985, 993 (Bkrtcy.D.N.D.1987). (Court indicated that a creditor's own testimony as to what it would charge for a loan under a given set of circumstances should be considered). In Minnesota, Judge Kressel found that "absent any evidence of collusion or discriminatory policies, the interest rate which the creditor involved would charge to the debtor in the present regular loan market is presumptively the correct interest rate, keeping in mind that the ultimate decision about the quality of the security and risk of default is for the court and not the creditor." *In re Citrowske,* 72 B.R. 613, 617 (Bkrtcy.D.Minn.1987).

The divergent opinion taken by bankruptcy courts in setting the discount rate is largely superficial. A close examination of the cases will disclose that the courts are all generally considering the factors enumerated by *Collier* and adopted by the Eighth Circuit.

■ The Bankruptcy Court for the District of Nebraska previously concluded that

**600**

in Chapter 12 cases the discount rate applicable to secured claims under § 1225 should generally be determined by adding two percent to the interest rate payable on a United States treasury bond that has a term comparable to the payout period on the secured claim under the plan. *See In re Wichmann, supra,* at 721. In this case the Bank contends that the Wichmann decision should not be followed because it is inconsistent with the decisions of the Eighth Circuit Court of Appeals.

■ Under the *Collier* formulation quoted above, bankruptcy courts must consider three factors in selecting the discount rate:

1. The prevailing market rate for a loan for a term equal to the payment period.

2. The quality of the security.

3. The risk of subsequent defaults.

In considering the "prevailing market rate", one should observe that there is no "market interest rate" for the "coerced loans" made by secured creditors under a Chapter 12 plan. There is no evidence in this case as to what interest rate would be charged in the private sector on a consensual loan that was in *all* respects comparable to the Chapter 12 coerced loan.

However, as noted by the Ninth Circuit, "[t]he interest rate on treasury bills is one indicator of the range of prevailing market interest rates. It is an appropriate starting point for calculating the § 1129(a)(9)(C) rate of interest." *In re Camino Real Landscape Maint. Contractors, supra,* at 1506. In selecting the discount rate, one must select a market interest rate for a term generally equal to the repayment term under the plan. *In re Wichmann* is consistent with the Eighth Circuit's mandate that "prevailing market rates" be considered since under *In re Wichmann,* the discount rate is selected based upon a consideration of the interest rate payable on treasury bills of an appropriate maturity. In selecting an appropriate treasury bill, it is not necessary to select a treasury bill that has an actuarial duration exactly the same as the duration of the payout period under the plan.

■ In the Eighth Circuit, the second factor to be considered by the bankruptcy court in selecting a discount rate is the quality of security. The consideration of the quality of collateral must be made in the overall context of the Chapter 12 treatment of secured claims. The plan cannot be confirmed unless the creditor retains its lien in its collateral. *See* § 1225(a)(5)(B)(i). The debtors' use, sale or lease of collateral under the Chapter 12 plan is subject to the adequate protection requirements of § 363(e). *See* § 363(1). If the secured creditors' property interest in collateral is not adequately protected, the plan cannot be confirmed, because to do so would violate § 363(e), and the fifth amendment. Thus in all Chapter 12 cases, before considering the discount rate, the court must determine that the creditors' property interest in the collateral is protected, and that upon default the creditor will realize value from the collateral in the amount of its secured claim.

■ Even though the secured creditor's interest in collateral is theoretically protected, there is usually no absolute assurance that the secured claim will be paid in full. In setting the discount rate, the bankruptcy court must thus consider the quality of collateral since it is relevant to a determination of whether a "riskless discount rate" may be used or whether such a rate should be adjusted to reflect that the creditor does not have absolute assurance that its secured claim will be paid. If there was absolute assurance of repayment then the riskless discount rate, such as the rate payable on treasury bills of comparable maturity, might be appropriate.

*In re Wichmann* does not directly consider the quality of collateral in setting the discount rate. However, *Wichmann* does adjust the treasury bill rate upwards by two percent to reflect the Chapter 12 risks. Such an adjustment is sufficient if the value of the collateral is expected to be stable, or if the creditor is sufficiently overcollateralized. In the case before me, the *Wichmann* adjustment for risks is not sufficient to reflect the instability of cattle prices.

The third factor to be considered in setting the discount rate is the risk of default. In Chapter 12 cases, the risks of default may be conceptually divided into two categories:

(1) General risks that are present in all Chapter 12 cases.

(2) Personal risks which are unique to the particular facts and circumstances of the case, such as the debtor's incapacity or record of poor performance.

In *Wichmann,* Judge Mahoney identified and took into account the generalized risks associated with Chapter 12:

Those risks include the basic unpredictable nature of the agricultural economy itself which cause farmers, creditors and judges to rely upon assumptions concerning prices and yields, the value of the dollar, the weather, foreign production, interest rates and government policies, any or all of which may change to the benefit or the detriment of the debtor's Chapter 12 plan. In addition to the above-listed factors, if the plan fails and the case is dismissed, the creditors will still incur collection costs involved in the foreclosure proceedings or, in the case of personal property, replevin proceedings.

*In re Wichmann, supra* at 721.

Under *Wichmann,* the appropriate treasury bond rate is adjusted upwards by two percent to reflect these generalized risk factors.

I conclude that the method of selecting the discount rate enunciated in *Wichmann* is in compliance with the decisions of the Eighth Circuit Court of Appeals, except to the extent that *Wichmann* does not consider on a case-by-case basis either the collateral involved or the "personal risks of default." However, *Wichmann* specifically contemplates that a creditor may present evidence on the "special circumstances concerning the particular debtor or the particular loan." The *Wichmann* decision thus provides a mechanism for full compliance with the standards enunciated by the Eighth Circuit.

The *Wichmann* approach to setting the discount rate has the considerable administrative advantage of providing a way to set the discount rate in most cases without litigation while permitting a full evidentiary hearing when there are reasonable disputes as to material facts.

Since July of 1987, the *Wichmann* decision has been consistently applied in Nebraska Chapter 12 bankruptcy cases. It has provided the parties to Chapter 12 cases a considerable degree of certainty as to the discount rate issue. Absent *Wichmann,* there would be more litigation at considerable expense. In the vast majority of cases, the *Wichmann* decision has facilitated the effective resolution of disputes in a manner acceptable to the parties. *Wichmann* is consistent with the Eighth Circuit decisions and this Court will follow *Wichmann* in the interest of uniformity of decision within the District of Nebraska. In cases where the consideration of the quality of the collateral or the "personal risks" of default justify a discount rate different from the *Wichmann* rate, the Court will consider evidence on such considerations.

Having given consideration to all of the factors enunciated by the Eighth Circuit, and having given special consideration to the quality of the collateral in this case, the Court concludes that a discount rate calculated pursuant to *Wichmann* on the effective date of the plan shall apply as to that portion of the loan secured by equipment and real estate, and that the discount rate on that portion of the loan secured by the cattle should be the rate calculated pursuant to *Wichmann,* plus two and one-half percent (*i.e.,* four and one-half percent above the applicable treasury bill rate).

*Validity of Mortgage*

The Riesens contend that the Bank's mortgage is invalid for two reasons. First, the Riesens claim that the Bank's mortgage is invalid because it was given for no new consideration and for past indebtedness. Second, the Riesens claim that the Bank's mortgage on the inherited one-half interest is invalid because the mortgage covers the Riesen one-half interest as well as the inherited one-half, and the land contract covering the Riesen one-half contains the following limitation on assignment:

14. (*Limitation of Assignment*) Buyers shall not assign this Agreement, either absolutely or as collateral security, or convey any interest in the real estate being acquired hereunder, without the prior written consent of Seller. In the event that this provision is violated, Seller may immediately declare the entire unpaid principal balance and all accrued interest due and payable, and proceed as provided in the provisions at paragraph 13 hereof, with respect to default.

Seller agrees that it will not withhold consent unreasonably, and further agrees to consent to any such assignment or conveyance in the event that Buyers agree to guarantee performance hereof by any such transferee.

In Nebraska a pre-existing debt is valuable and sufficient consideration for a mortgage given to secure that debt. *O'Neill Production Credit Ass'n v. Mitchell*, 209 Neb. 206, 209, 307 N.W.2d 115, 118 (1981). In this case, the mortgage was given to secure a pre-existing debt and future operating loans. Thus, the mortgage is not invalid for lack of consideration.

The Court reads the land contract as only limiting the transferability of the Riesen one-half interest. The contract used the following language: "Buyers shall not assign this Agreement ... or convey any interest in the *real estate being acquired hereunder* ..." (emphasis added). Thus, even if the restraint on alienation is valid, it does not apply to the inherited one-half interest. The Bank does not claim any security in the Riesen one-half. The Riesens' objection to the validity of the Bank's mortgage in the inherited one-half interest is overruled.

*Feasibility*

Because the Court holds that the plan cannot be confirmed, this issue is moot.

For the reasons stated, the proposed Chapter 12 plan is not confirmed. A separate order will be entered consistent herewith.