**In re James E. CAUDILL and Carolyn L. Caudill, Debtors.**

**Bankruptcy No. 86–02674–NA FP.**

United States Bankruptcy Court, S.D. Indiana, New Albany Division.

Feb. 12, 1988.

James E. Caudill, pro se.

Carolyn L. Caudill, pro se.

Basil H. Lorch, III, of Lorch, Moyer, Gesenhues & Bitzegaio, New Albany, Ind., for debtors.

Steven K. Robison of Montgomery, Elsner & Pardieck, Seymour, Ind., for secured creditor and objector, Federal Land Bank of Louisville, (hereinafter "the Bank").

Joseph M. Black, Jr., Seymour, Ind., for the standing Chapter 12 panel Trustee.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING AMENDED CHAPTER 12 PLAN

MICHAEL H. KEARNS, Bankruptcy Judge.

This matter is before the Court on the confirmation of debtors' proposal of a Plan for adjustment of their debts pursuant to

Chapter 12 of the U.S. Bankruptcy Code. This action is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A) and (L).

Hearing on confirmation of debtors' Plan and Federal Land Bank of Louisville's Objection to Confirmation was held and concluded on the 28th day of April, 1987 at New Albany, Indiana. This confirmation hearing was held pursuant to 11 U.S.C. Section 1224, and the Court found that cause existed for the hearing being concluded more than forty-five (45) days after the filing of the Plan, to-wit: the Plan was filed on March 3, 1987, which is 56 days between the date of the filing of the Plan and the conclusion of the hearing on confirmation.[1]

Debtors appeared, each in their own person, and by counsel, Basil H. Lorch, III, of Lorch, Moyer, Gesenhues & Bitzegaio of New Albany, Indiana; secured creditor and objector, Federal Land Bank of Louisville, (hereinafter "the Bank"), appeared by representative and by counsel of record, Steven K. Robison of Montgomery, Elsner & Pardieck of Seymour, Indiana; and the standing Chapter 12 panel Trustee, Joseph M. Black, Jr., attorney at law of Seymour, Indiana, also appeared.

There being no preliminary motions, witnesses were sworn, evidence was heard and concluded, and all parties rested; counsel for proponent of the Plan and objector gave closing remarks.

In addition, counsel for objector moved and was granted opportunity to file, subsequent to the hearing on confirmation, an appraisal of the subject land. Counsel for objector did, in fact, file such written appraisal, and the same, by agreement, was and is incorporated as part of the record and evidence in support of the objector's position. Counsel for objector also filed a post-hearing brief. The Court received said post-hearing filings and fully weighed

and considered the same, as well as all of the evidence presented at the hearing.

The Court further observed the demeanor of the witnesses, as well as considered their background, character, qualifications, and interests in and to the proceeding. Having had the matter under advisement, the following Findings of Fact and Conclusions of Law are issued, and the Findings of Fact are and should be considered as Conclusions of Law, and vice versa.

## BACKGROUND AND DESCRIPTION OF FARM OPERATION

The debtors are farmers who operate a livestock and grain farm. Joint debtor, James E. Caudill, is 47 years of age, and has been a farmer in excess of twenty-five (25) years. His wife, Carolyn L. Caudill, age 46, assists the husband in the farm and cattle operation. In addition, she has within the last year, secured outside employment as a sales person at a small dress shop in a neighboring rural community, North Vernon, Indiana. She earns a minimal wage of One Hundred Nine Dollars ($109.00) net income per week.

Debtors have three children, two daughters, ages 21 and 14, and one son, age 17. All children live at home. Although the 21 year old daughter is emancipated and independently employed, she contributes to the family resources and furnishes household and family chores and other assistance to the family unit. The other two (2) children are dependent economically, but they contribute to and are an integral part of the family farm labor force. This debtor family furnishes the entire labor for the farm; no outside hired help is used.

The debtor and his wife have owned, worked and lived on the farm for over twenty-five (25) years. Part of the farm belonged to debtor, James E. Caudill's, father, now deceased. This farm, including

---

1. The cause found for the time frame was that the hearing date was agreed to by and between the proponent of the Plan and the objector. Further, this Court is a traveling court which sits on a rotating basis in three Southern Indiana cities, and the agreed hearing was set during the earliest regularly scheduled divisional visit to the New Albany Division. Additional

cause is that the Court did and does have an extremely heavy case load, much of which involves Chapter 12 and other farm related cases, and that this, when coupled with the traveling and scheduling considerations, places a heavy and unique demand upon the Court's time and availability.

debtors' residence, is located in Southeastern Jennings County, Indiana.

Jennings County consists of three hundred seventy-eight (378) square miles and is approximately fifty (50) miles northeast of Louisville, Kentucky. Based upon the 1980 census, the population of this County was twenty-two thousand eight hundred (22,800) persons.

Roughly seventy-four percent (74%) of the County's population is rural with about only nineteen percent (19%) of these considered to be farm residents based upon a 1984 estimate. Further, it was estimated that the population of Jennings County was sixty (60) people per square mile.

The 1980 census indicated that of the total County population, only four hundred forty-two (442) individuals were listed in the farming category. Most farm owners or operators have "off the farm" jobs, as farming as a sole means of livelihood is extremely difficult. These facts underscore generally low agricultural values and weak market activity.

The Caudill farm may best be described as consisting of two (2) parcels, each including a number of individual tracts, one (1) parcel comprising three hundred twenty (320) acres, and the other one hundred eighty (180) acres. In addition, three hundred thirty-five (335) acres of land are leased on a cash rent basis.

The debtors worked six hundred sixty-nine (669) acres of tillable land of which two hundred ninety-one (291) acres were planted in corn, three hundred seventy-eight (378) acres in beans, and in addition, debtors worked a tobacco crop estimating a yield of 6,500 pounds. Debtors also conduct a beef cattle operation, calving the same and have two hundred (200) head.

These Hoosier debtors are, in the opinion of this Court, representative of a true American farm family.

### DEBTORS' PLAN OF FARM REORGANIZATION AND TREATMENT OF CREDITORS

The projections presented to the Court by way of evidence of yields and income in support of their Plan of Reorganization are, as follows:

| CROP | PER ACRE | RATE PER BUSHEL | PROJECTED YIELD |
|---|---|---|---|
| Corn | 100 bushels | $ 3.03 | $88,173.00 |
| Beans | 35 bushels | $ 4.50 | $59,535.00 |
| Tobacco | No yield per acre | | $ 9,425.00 |

| CATTLE | VALUED AT |
|---|---|
| 200 head | $25,000.00 |

Debtors further testified that Eighteen Thousand Dollars ($18,000.00) would be necessary for living expenses, and that their projected income for the calendar year 1987 would be One Hundred Fifty-seven Thousand One Hundred Thirty-three Dollars ($157,133.00), less operating expenses of Eighty-two Thousand Two Hundred Thirty Dollars ($82,230.00).

They further projected to the Court that from the reorganized Plan of operation a dividend in excess of five percent (5%) would be made to unsecured creditors. The life of the Plan proposed was for a term of five (5) years.

Subsequent to the debtors filing their Chapter 12 Petition, Statement of Financial Affairs and Schedules, a 341 meeting of creditors was conducted by the Chapter 12 Trustee, Joseph M. Black, Jr., who filed an analysis of debt, which analysis remains without dispute, and which is, as follows, to-wit:

ANALYSIS OF DEBT

I.  Secured Debts:

| Name of Creditor | Amount of Debt | Description of Collateral | Value of Collateral |
|---|---|---|---|
| Federal Land Bank | $147,000 | 320 Acres | $ 150,000 |
| Farmers Home Administration | $650,000 | Mortgage & Chattel Lien | $ 78,000 |
| First National Bank | $ 10,000 | Farrow House & Equipment | $ 20,000 |
| ASCS | $ 9,000 | Grain Bins | $ 9,000 |
| John Deere | $ 1,900 | Hay Baler | $ 3,500 |
| Agricultural Services, Inc. | $ 9,000 | Grain | $ 9,000 |
| Dupont State Bank | $ 7,800 | 2010 John Deere | $ 2,000 |

II. Total Amount of Priority Debts (from A-1 Schedule)  – 0 –

III. (1) Amount of Unsecured Debt (from A-3 Schedule)  $ 118,000

(2) Probable Unsecured Portion of Secured Debt  575,000

Total Unsecured Debt:  $ 793,000

The Plan which the debtors have presented to this Court and which was amended immaterially at the hearing on confirmation, proposes to treat their creditors in the following manner:

TREATMENT OF SECURED CREDITORS UNDER THE PLAN:

| NAME OF CREDITOR | AMOUNT OF CLAIM | YEARS PAID OUT | FIXED INTEREST RATE | ANNUAL PAYMENT |
|---|---|---|---|---|
| FmHA | 3 distinct claims: w/stipulated values | | | |
| | 1. land mtg. $90,000 | 30 | 5% | $ 5,855.00 |
| | 2. equipment $10,000 | 7 | 4½% | $ 1,700.00 |
| | 3. cattle $ 8,500 | 7 | 4½% | $ 1,450.00 |

(Debtors have agreed to value these claims greater than the Trustee's report to allow FmHA to receive greater secured payments).

| NAME OF CREDITOR | AMOUNT OF CLAIM | YEARS PAID OUT | FIXED INTEREST RATE | ANNUAL PAYMENT |
|---|---|---|---|---|
| First National Bank | $10,000 (plus interest and atty. fees pursuant to 506(b) as an over-secured creditor) | 5 | 10% | $ 2,549.00 |
| ASCS | $ 9,000.00 | 5 | 10% | $ 2,294.00 |
| John Deere | $ 1,900.00 | 5 | 10% | $ 484.00 |
| Agricultural Services, Inc. | $ 10,401.00 | 30 days | — | In Full |

(Once this debt is paid, Agricultural Services, Inc. has agreed to extend to the debtors a $30,000.00 line of credit).

| NAME OF CREDITOR | AMOUNT OF CLAIM | YEARS PAID OUT | FIXED INTEREST RATE | ANNUAL PAYMENT |
|---|---|---|---|---|
| Dupont State Bank | $ 7,800.00 | 5 | 10% | $ 510.00 |
| Federal Land Bank | $150,000.00 | 2 | 9½% | $16,776.00 |

All the secured creditors except the Federal Land Bank of Louisville approved their treatment by way of specific agreements, stipulations, or absence of objection, and no other creditor appeared at the hearing on confirmation of debtors' Plan.

Over the course of the five (5) year Plan, the unsecured creditors will receive a dividend of approximately five percent (5%) of their allowed claims. The total amount of unsecured claims is Six Hundred Ninety Thousand Dollars ($690,000.00). It is significant to note in considering this five percent (5%) Plan that, of this total unsecured debt load, over eighty percent (80%), or approximately Five Hundred Forty-three Thousand Dollars ($543,000.00), is comprised of that portion of the FmHA claim which is undersecured, and that FmHA agreed to their treatment in receiving such a dividend as to the unsecured portion of their allowed claim. Further, in support of this low unsecured dividend Plan, proponent argues and the Court considers that there are only two (2) other unsecured creditors. They are Dupont State Bank of Indiana with an allowed claim of Seventy-eight Thousand Dollars ($78,000.00), and Dupont Feed Mill with an allowed claim of Forty Thousand Dollars ($40,000.00). Judicial notice is taken that Dupont Feed Mill is a Chapter 7 debtor corporation itself, which case is nearing completion in this Court. It is finally to be noted that neither of the two (2) remaining unsecured creditors objected to their treatment as members of this unsecured class.

### ROLE OF TRUSTEE IN A CHAPTER 12 FARM REORGANIZATION

At the hearing on confirmation of debtors' Plan, the Trustee appeared, participated, and examined the witnesses both for debtors and objector. At the conclusion of the hearing, upon inquiry by the Court, the Trustee recommended favorably that the Court confirm debtors' proposed Plan.

The Trustee's recommendation was that the Plan was proposed in good faith, was not by any means forbidden by law, and was feasible as debtors would be able to make all payments under the Plan and comply with its provisions. The Trustee further stated that the Plan was not in contravention of any of the requirements as set out in 11 U.S.C. Section 1225, and that said Plan represented debtors' best effort.

The Trustee, pursuant to his proscribed duties, not only made his analysis, but further assisted in valuations, which led to successful negotiations by and between the parties, and was instrumental in facilitating many agreements.

The role that the Trustee played in the instant case, and the success of his efforts were in complete conformity with the duties and responsibilities assigned to him under this law, (11 U.S.C. Section 1202), and envisioned to be performed by the Congress, which passed this pioneer legislation. As an officer of the Court, he assisted each and all of the parties litigant in delineating the particular issues of their disputes, the extent thereof, and played a major role in their resolution. The Trustee, in the instant case, performed most competently, efficiently, and effectively.

The Court is aware of recent cases in which Trustees have objected to confirmation of the Chapter 12 Plan on the basis of their Trustee fees.[2]

It is significantly important, and it does not go unnoticed, that the policy of the standing Chapter 12 Trustee for this Bankruptcy Court assesses only one percent (1%) as to secured claims regardless of the nature of the collateral underlying said claim, and ten percent (10%) as to unsecured claims. This one percent (1%) Trust-

---

2. E.g. *In re Hagensick*, 73 B.R. 710 (Bkrtcy.N.D. Iowa 1987).

Section 1202(d)(1)(B) does provide that the Trustee may receive up to ten percent (10%) of the payments made under the Plan (an aggregate of which does not exceed Four Hundred Fifty Thousand Dollars ($450,000.00) and three percent (3%) of amounts in excess thereof.

ee commission is as low a commission as could conceivably be imposed, and makes no distinction as to the nature of the collateral, whether the same be real estate or any type of personalty, such as equipment, livestock, crops, or any other type of chattel.[3]

This Court applauds this position of its standing Trustee. The result of the reduced assessment of administrative cost from that which is allowable under the Code can only aid in achieving more proposed and confirmed Plans. The resulting economy of administrative costs can and will inure both to the benefit of the debtors and creditors. It is apparent that such a Trustee's posture minimizes he or she being a consideration or a perceived obstacle in the formulation, proposing, and negotiation of a confirmable Plan.

This Trustee rate structure also minimizes, if not eliminates, the Trustee as an adversary or one advocating his or her own interests., e.g. fees and commissions. It underscores the Trustee's role to be that of an official of the Court with accountability of screening, monitoring, disbursing, reporting, as well as other duties and responsibilities, as provided in 11 U.S.C. Section 1202. This Trustee's position further dramatically demonstrates his desire and willingness to compromise so that a successful Plan of Reorganization can more readily be achieved.

The importance of a Chapter 12 Trustee's role and responsibility cannot be minimized, as his or her oversight and participation was intended to be an integral part of the success of this legislation by its drafters. At the expense of appearing braggadocio, this Court would be remiss in failing to note, not only the quality of performance of the Trustee in this jurisdiction, but his credentials and qualifications. This standing Trustee not only is an outstanding practitioner of the law, but he also possesses unique mathematic and computer skills, and is a fully accredited and practicing

certified public accountant. Additionally, he has, prior to his trusteeship, served several years as counsel for Production Credit Association of this region and has vast farm credit system experience.

It is finally to be noted that a fair and realistic formula of administrative fee assessment by a Trustee makes him or her both perceived and real in a lack of predisposition to the debtor or creditor: foe to neither, but friend to both.

## THE FEDERAL LAND BANK'S OBJECTIONS TO PLAN

### I. A STATUTORY CONFLICT

11 U.S.C. 1225 vs. 12 U.S.C. 2015

■ One of the Bank's objections in this Chapter 12 proceeding is that the *Plan*, and not the Bank, establishes the interest rate of the indebtedness owing from debtors to creditor Bank.

The Bank argues that the interest rate which the Plan proposes to pay violates Section 1225(a)(3) in that it proposes a rate which is "forbidden by law". The "law" to which the Bank refers is Title 12 U.S.C. 2015 in which Congress had authorized the *bank* to determine its own interest rate.

While this Court does not deny that this law is controlling as to the bank's authority to set its own interest rates when contracting with a farmer, this Court finds that the specific language of 11 U.S.C. 1201 et seq. clearly gives this Court the authority, as well as the mandate, to determine the present value of the secured portion of a creditor's claim, whether the creditor be the Federal Land Bank or any other secured claim holder.

The mandate given the United States Bankruptcy Court by 11 U.S.C. 1201 et seq. is fundamental in that the Court must have the authority to consider an interest rate factor in deciding future payments to a farm plan creditor so as to achieve for said

---

**3.** It is to be acknowledged that the Trustee in the instant case is and has been a standing Chapter 12 Trustee in this non-pilot district, and accordingly, possessed the flexibility of adopting the within fee and rate structure. This Court is fully aware that the U.S. Trustee Program is soon to be implemented in this jurisdiction, and a Trustee's role, fee and responsibility may accordingly be affected.

creditor the much acclaimed indubitable equivalent; in simpler terms, to ensure for the creditor that future payments proposed under the Plan will be equal to the present value of secured creditor's collateral.

The interest rate factor must be considered and decided when there is to be a stream of future payments equal to the present value of the security. This Court finds that Title 12 U.S.C. 2015 may well control the operation of the Federal Land Banks throughout the nation, but in light of this new farm Bankruptcy legislation, it does not control the U.S. Courts, and consequently, said statute is inapplicable as forming the basis of an objection to a debtor's proposed Plan under Chapter 12 of the Code.

This type of argument had been raised many times by the Internal Revenue Service regarding its statutory interest rate provided in 26 U.S.C. Section 6621. Yet this argument has repeatedly been rejected. *U.S. v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986), *U.S. v. Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983), *In re Tacoma Recycling, Inc.,* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982), *In re Frost,* 47 B.R. 961 (D.Kan.1985), *In re Fisher,* 29 B.R. 542 (Bkrtcy. KS 1983), *In re Connecticut Aerosols, Inc.,* 42 B.R. 706 (D.Conn.1984).

Further, were 12 U.S.C. Section 2015 held to be applicable, then this Court would, of necessity, have to require the Bank to have its unsecured portion paid in full, plus interest on that unsecured portion. This is clearly violative of Section 1225(b), in that it unduly discriminates against all other unsecured creditors. Accordingly, this Court rejects this argument.

## II.  VALUATION

Another of the Bank's objections in opposing debtors' Plan of Reorganization, is that the *Plan* values the Bank's collateral, to-wit: real estate. More specifically, the Bank's objection is that the Plan fails to comply with 11 U.S.C. 1225(a)(5)(B)(ii).

The debtors set out in their schedule that the amount due and owing the Bank is One Hundred Forty-seven Thousand Dollars ($147,000.00). The debtors in their Plan propose to pay the Bank One Hundred Fifty Thousand Dollars ($150,000.00) over a period of twenty (20) years. However, it is to be noted that the appraisal of the Bank is for only two hundred eighty (280) acres rather than three hundred twenty (320) acres. This acreage distinction is only important as to eliminate confusion which occurred in the litigation of this case. The original schedules, and the Trustee's reliance and consequent analysis thereon, set out that the Bank's collateral was three hundred twenty (320) acres which was not correct. Inquiry by the Court and a subsequent amendment to debtors' Plan corrected this error by reducing Bank's collateral by forty (40) acres, which forty (40) acres is actually additional collateral secured by FmHA. Debtors' error and subsequent clarification and amendment does not affect the validity of either debtors' or Bank's appraisals as a per acre valuation is clearly determinable.

The debtors offered at trial as evidence an appraisal which indicated that the three hundred twenty (320) acres which secured this debt had a value of One Hundred Thirty-six Thousand Dollars ($136,000.00), thereby causing the Bank to be undersecured. This appraisal presented a Four Hundred Twenty-five Dollar ($425.00) per acre valuation. Determining the correct acreage in dispute to-wit: 280 acres, debtors' appraisal amounted to the sum of One Hundred Nineteen Thousand Dollars ($119,000.00).

The Bank offered appraisal evidence which valued the subject real estate at One Hundred Fifty Thousand Dollars ($150,-000.00), and which appraisal clearly dealt with two hundred eighty (280) acres, thereby making them over collateralized. The Bank's appraisal has presented a per acreage valuation of Five Hundred Thirty-six Dollars ($536.00). The Bank argued they were over collateralized and as such, should be allowed, via Section 506(b) interest on their claim, which they contend should be calculated as "market rate", if not at "contract rate" interest.

The Court, having reviewed the appraisals of each party, determines that more credence should be given to the appraisal of the Bank since it is more thorough in its evaluation approaches and more precise as to the nature and qualities of the real estate.

The Court, having considered the comparable sales in the area, and having considered the unique qualities of this particular piece of land, such as soil type, crop yield history, projected land use income, flood susceptibility, transportation assessability, as well as improvements on the real estate,[4] does now FIND and CONCLUDE that the appropriate value of this real estate is Five Hundred Five Dollars ($505.00) per acre, or One Hundred Forty-one Thousand Four Hundred Dollars ($141,400.00) for the two hundred eighty (280) acre tract in question, thereby rendering the Federal Land Bank to be an undersecured creditor.

## III. THE INTEREST RATE ISSUE

Reorganization cases under Chapter 12 of the U.S. Bankruptcy Code now abound in large number.

One issue that has already emerged, and one which appears with increasing regularity, is whether the United States Bankruptcy Court has the power and authority to change and/or fix interest rates originally contracted and, if so, what rate of interest or methodology of rate-fixing should the Court impose or employ. Reported cases proliferate on this issue and decisions vary in all directions and reasoning.

VARIABLE OR FIXED:

The Plan objector, the Federal Land Bank, asserts that a variable rate of interest is necessary in these proceedings. As to this assertion, it is to be noted that the Court, in adjudicating whether a proposed Chapter 12 Plan should be confirmed, must of necessity do a liquidation analysis of the payments to unsecured creditors to determine whether or not said unsecured creditors would receive as much as, if not more than, they would have received under a Chapter 7 liquidation.

Through the testimony of the Bank's agent, Marcus McCance, the Court learned that the Caudills were given a Class C rating, the Bank's lowest rating, indicating a high risk borrower. He testified that while the Bank would not issue any loan to a new borrower with a class C rating, the Bank would extend credit to a class C borrower who has fallen into that class after initially borrowing as a member of a higher class. The witness then concluded that given the Bank's formula, based on its cost of borrowing monies, the risk involved in lending to a class C borrower, coupled with the factual scenario in this case, the Bank would calculate the interest rate to the Caudills at 12.75% adjustable quarterly.

Pursuant to Section 1225(a)(5)(B)(i), (ii), the Court shall confirm a Plan if:

"(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim;"

Therefore, as the Code provides, the Court must determine that the stream of future payments which a secured creditor is to receive under a Plan must be greater than or equal to the present value of the collateral. Yet, if a variable interest rate were permissible during the life of a Plan, it would be impossible for this Court to perform this liquidation analysis since it could not determine what interest rate might be imposed in the future by creditor regulations and/or the market place. In the case of the Federal Land Bank, this Court would be held hostage to, and at the mercy of, a non-judicial board which may from time to time call for a variable interest rate. This fact of the setting of variable interest rates by said board has historically been the case, and such course of conduct may continue to be the operating procedure governing the loan transaction activities of the Bank. Such a procedure would result in the changing of interest rates and corresponding periodic payments to secured claimants. This approach would

---

**4.** See Generally *In re Rott*, 73 B.R. 366 Bkrtcy. D.N.D.1987 for a full discussion of the manner and method of real estate valuation appropriate in a Chapter 12 scenario.

prevent this Court from performing its liquidation analysis which is specifically required before confirmation of a proposed Chapter 12 Plan can be approved. Consequently, the variable interest rate called for by bank regulations is inapplicable and cannot be looked to as it impedes this Court's mission required by Congress in the newly legislated Chapter 12 relief provisions in the United States Bankruptcy Code.

Not only is it the province, but it is the responsibility of a United States Bankruptcy Court to examine and affect interest rates originally contracted by and between private parties, commercial lending institutions, and governmental or chartered financial institutions. This does not mean, however, that individual negotiations between debtors and creditors could not provide for a variable interest rate over the life of the Plan, if said variable interest rate at least does not vary during the term of repayment to unsecured creditors.

In addressing this exact issue, the Eighth Circuit Court of Appeals has stated:

"[2] We also reject the bankruptcy court's finding that a floating rate of interest would better accommodate fluctuations in interest rates in general, and would thus better provide the government with the present value of its claim. That section 1129(a)(9)(C) contemplates the use of a fixed interest rate is evident in its requirement that present value be determined "as of the effective date of the plan." 11 U.S.C. Section 1129(a)(9)(C). Moreover, the use of a floating interest rate would be administratively difficult and would complicate a determination of the feasibility of the debtor's reorganization plan, a prerequisite for confirmation."

*Neal Pharmacal, supra,* at 1286.

The problem was discussed in full by the *Fisher* Court, and this Court adheres to the logic and reasoning set out in that discussion:

The Court knows of no published opinion in which a court has approved a variable discount rate during the life of the plan, for good reason. The trustee in this district computes and informs the Court if the debtors' proposed payments will pay out in the statutory time limit. See 11 U.S.C. Section 1322(c). A number of plans run 60 months, the statutory good cause maximum. Furthermore, most times, the debtor is dedicating all of his discretionary available income to plan payments, and the debtor has little or no ability to increase his payments. If a 5 year plan was confirmable in 1983 at a 12% discount rate, leaving the debtor virtually no discretionary income after plan payments, but the discount rate rose to 15% in 1984, the debtor would be required to modify his plan to make additional payments in order to pay out in 5 years. The debtor, however, could not make such additional payments and the plan would have to be dismissed. In 1983 at the confirmation hearing, knowing interest rates could probably rise and knowing the debtor did not have the ability to make payments under a plan where the discount rate was 15%, the Court could not find that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. Section 1325(a)(6). The trustee could not determine whether confirmation mathematically should be recommended. Chapter 13 confirmations simply could not be made.

The administrative infeasibility of a variable interest rate is certainly obvious in the IRS' own unwillingness to set its Section 6621 interest rate more than twice a year, even after the Office of Management and Budget labelled it unreflective of current market conditions.

Furthermore, Section 1325(a)(5)(B)(ii) provides the value to be received should be judged "as of the effective date of the plan", not the value at various points during the plan. The question in determining the present value of a stream of payments is what is the value today of payments to be received periodically over a period of time. See M. Sherman, Comprehensive Compound Interest Tables 118–9 (1982); D. Thorndike, Thorndike's Encyclopedia of Banking and Financial Tables 8–4 (rev. ed. 1980). The value today presumes a rate of interest today.

Thus, in addition to being administratively infeasible, and unsupported in published case law, a variable discount rate is also contrary to the concept of present value contained in 11 U.S.C. Section 1325(a)(5)(B). The only Court addressing the issue of variable discount rates has rejected the idea. *See, In re Stafford*, 24 B.R. 840 (Bkrtcy.D.Kan.1982) (Franklin, J.). For the above reasons, this Court likewise rejects variable discount rates. 29 B.R. at 551–52.

It is to be noted that this Court must deal with claims in making its decision on the grant or denial of confirmation of a proposed Chapter 12 Plan of Reorganization. A claim is separate and distinct from a contract, mortgage, promissory note, or other form of secured or unsecured contractual indebtedness. In dealing with claims, the Court must consider the status of the claim as to whether it is secured or unsecured, and if secured, the Court must value said collateral; and in providing for future payments, must establish the appropriate discount rate to guarantee that the creditor does receive the full value of the security. This final consideration will determine the amount of future payments to be made to the secured claimant and the length of time that such payments must be made. To accomplish these tasks, it is axiomatic that a rejuxtaposition of the contractual posture of the parties may, and at times must occur, including the changing of and fixing the interest rate of return to the claimant on claimant's collateral. Only in this manner can the Court guarantee that claimant is paid the full value of its collateral, as of the date of confirmation.

---

5. Congress specifically rejected a contract rate of interest for present value when it defeated a proposed amendment to the Bankruptcy amendments and Federal Judgeship Act of 1984 requiring the contract rate of interest to be paid in Chapter 13 Plans. *See, In re Lenz*, 74 B.R. 413, 417 (Bkrtcy.C.D.Ill.1987), quoting 5 Collier 1325.06(4)(b)(iii)(B). This Court notes that the confirmation requirements under Chapters 12 and 13 are substantially the same when dealing with the present value of secured claims.

6. The Internal Revenue Code rate; *In re Ziegler*, 6 B.R. 3 (Bkrtcy.S.D.Ohio 1980).

## THE VARIOUS APPROACHES:

The setting of such an interest rate, which in effect is a discount rate guaranteeing present value based on future payment, has been dealt with by many courts and in the following manners:

1. Contract Rate Approach. Some courts have proposed the use of the contract rate; *In re Cooper*, 11 B.R. 391 (Bkrtcy.N.D.Ga.1981).

This Court rejects this approach for reasons stated earlier as it is the responsibility of the Court to examine, and if necessary, adjust interest rates originally contracted by and between private parties, commercial lending institutions, and governmental or chartered financial institutions.[5]

2. Statutory Rate Approach. Other creditors have argued that they are entitled to statutorily imposed rates of interest.[6] However, this Court would state, as it did in the case of contract rates, that the same must of necessity hold true when dealing with states' judgment interest rates, Internal Revenue Service rates, or all other statutorily imposed agency interest rates, unless the claim is one that is a nondischargeable claim as set out in 11 U.S.C. 523. Once an entity has been brought into the jurisdiction of the Bankruptcy Court, it is this Court's province to determine the interest rate.

3. Market Rate Approach. The market rate has been adopted by several circuits and has been applied in recent Chapter 12 cases and is argued by this creditor as being the appropriate method for this Court to use in determining the interest rate to be imposed on its claim.[7]

---

The State's statutory rate; *In the Matter of Crockett*, 3 B.R. 365 (Bkrtcy.N.D.Ill.1980).

T Bill via Federal Judgment Statute Title 28 U.S.C. 1961.

*In re Tacoma Recycling, Inc.* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982).

*In re Connecticut Aerosols, Inc.*, 42 B.R. 706 (D.Conn.1984).

But note that courts that have chosen to follow the Federal statutory interest rate under Title 28 U.S.C. 1961 have done so because this Federal rate is determined by the current Treasury Bill rate.

7. Sixth Circuit:

This Court, however, has chosen not to follow the market rate approach. The Family Farm Reorganization Act is, in fact, a national act and should be treated similarly throughout the United States. Under this approach, one would benefit certain creditors and debtors in certain parts of the nation to the detriment of certain farmers and creditors in other parts of the nation. Because of the world economy in which our family farmers now must operate, these farmers should at least be on equal footing throughout the United States. It is further noted, that since this Court sits in three (3) different regions of the State of Indiana, the market rates vary between each of said regions. Selecting this approach would prevent a uniform standard, not only for debtors within this State, but more so, and in varing degrees, for farmer/debtors throughout the various fifty (50) states of our nation.

This approach does not take into consideration the services provided and required by the Court and its personnel, i.e. the standing Chapter 12 Trustee which must oversee and keep abreast of all debtors. When this factor is taken into consideration, this substantially reduces the cost outlay of a financial institution in reviewing and monitoring this particular account. An unearned percentage would result in that in-house services traditionally performed and factored in the rate would not be provided by the lender/creditor, but by the Trustee. This would operate to provide windfall to the lender/creditor and unfairly operate to the detriment of the debtor during a critical period of reorganization.

4. Cost of Funds Approach. One Court in a recent Chapter 12 case utilized the cost of funds approach.[8] In the case at bar, this Court heard lengthy testimony with regard to the cost of funds for the Bank. This testimony brought out that the Bank's cost of funds is based upon the Land Bank Farm Bond Rate,[9] plus cost of overhead, plus a profit margin, which together, at the date of hearing, equaled approximately 11.6%.

This Court opines that this methodology is unfair and inequitable to all parties, debtors and creditors alike, in that by using this approach, a poorly run organization would be benefited to the detriment of an efficient creditor organization. Further, the cost of funds approach would vary between entities, and in fact using this approach, government entities could arguably be allowed a zero discount rate in that they are fully funded by taxpayers, and that, therefore, obviously one might argue their cost of funds is zero. Such a consequence would dramatically cost the taxpayer, and would in fact be at odds with what the Congressional intent has been pursuant to the Gramm–Rudman Act and other contemporary budgetary legislation.

5. Interest Rate Averaging. While this Court acknowledges that this method might well provide a more nationally standardized methodology, there exists the likelihood that its utilization may well skew the interest rate downward to the substantial detriment of the creditors. The reasoning for this is that to average interest rates, the Court must take into account the below-market interest rates offered by governmental entities and agencies, as well as statutory interest rates, Treasury Bill interest rates, and lending institution interest

---

*Memphis Bank and Trust Company v. Whitman,* 692 F.2d 427 (6th Cir.1982).

Eighth Circuit:

*U.S. v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986); *Insurance Company of America v. Monnier,* 755 F.2d 1336 (8th Cir.1985).

Eleventh Circuit:

*U.S. v. Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983).

*In re O'Farrell,* 74 B.R. 421 (Bkrtcy.D.N.D. Fla.1987).

CHAPTER 12 CASES:

*In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125 (Bkrtcy.D.Mont.1987).

*In re Lenz,* 74 B.R. 413 (Bkrtcy.C.D.Ill.1987).

**8.** *In re Hardzog,* 74 B.R. 701 (Bkrtcy.W.D.Okla. 1987).

**9.** Although today's market exhibits a high degree of volatility, the Federal Land Bank's farm bond yields have historically been higher than Treasury Bond rates. As of the date of this opinion, the Land Bank Farm Bond yield is currently 8.66%, while a 20 year Treasury Bond rate is 8.40%.

rates. Further, because of the substantial number of land contract sales between private individuals, it would be a statistical quagmire to come up with a suitable average in that the requirement of proof to the debtors presenting these contracts could well run into several days of testimony. The consequent cost of compilation, preparation and litigation is obvious.

6. Approximation Approach. This methodology employs a consideration of the various states' statutes, ever-changing economic conditions, individual court interpretation of equitable principals, previously adopted court interest rates throughout the entire judiciary, including, but not limited to, Bankruptcy Courts, as well as a host of other "educated approximation rates". This Court simply believes that such divergent ill-defined and individualized interpretations cannot by their very nature serve as a standard upon which reliance could or should be predicated.

7. Treasury Bill and Treasury Bond. The cost and yields of these instruments have been used enumerable times by the Courts in establishing an appropriate discount rate for the determination of "present value, as of the effective date of the Plan", as required under the liquidation analysis necessary for Plan confirmation as set forth in Section 1129(a)(7)(A)(i), Section 1225(a)(5)(B)(ii), Section 1325(a)(5)(B)(ii).[10]

Treasury Bills and Treasury Bonds are however generally recognized as "risk free" investments. Therefore, some courts have recognized the necessity of adding additional percentage points for equalizing the risk involved in receiving payments from a debtor in Bankruptcy. *Willis, supra,* at 557; *Smithfield Estates, supra,* at

225 ftn. 5; *Fisher, supra,* at 543–44, 551; *Camino Real Landscape, supra.*

█ This Court feels compelled to enunciate a standard to be followed in the affixing of an appropriate rate of interest to a holder of a secured claim, so as to provide such holder with the present value, as well as to allow debtor the opportunity to reorganize by providing a feasible but fair and equitable stream of future payments. This standard should not only aid in facilitating negotiations resulting in increased pre-confirmation agreements, but will also provide an announced predicate from which parties in litigation may affix their positions.

The treasury bill and the treasury bond yields are the foundation upon which the establishment of a predictable, yet flexible, discount rate may be based. These daily published yields, together with the following considerations, are adopted by this Court as the standard for determining present value of a secured claim.[11]

In determining such a standard, this Court, when reviewing a proposed Plan discount rate (the interest rate factor), must first look to the interest rate that would guarantee a riskless rate of return which, in a risk free society, would provide full value for the claim.

More specifically, the Court adopts the standard as follows, to-wit:

1. For short term repayment of claims, and/or unsecured claims, the current published yield for the one (1) year Treasury Bill, plus a risk factor of –0– to a cap of 3 percentage points;

2. For proposed long term claim repayment and secured claims, the published

**10.** CHAPTER 13:
   *In re Fisher,* 29 B.R. 542 (Bkrtcy.D.Kan.1983); *In re Redeker,* 27 B.R. 734 (Bkrtcy.D.Kan.1983);

   *In re Jewell,* 25 B.R. 44 (Bkrtcy.D.Kan.1982); *In re Frost,* 47 B.R. 961 (Bkrtcy.D.Kan.1985); *In re Trent,* 42 B.R. 279 (Bkrtcy.W.D.Va.1984); *In re Corliss,* 43 B.R. 176 (Bkrtcy.D.Or.1984); *In re Willis,* 6 B.R. 555 (Bkrtcy.D.N.D.Ill.1980).

   CHAPTER 11:
   *In re Tacoma Recycling, Inc.* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982); *In re Connecticut Aerosols, Inc.,* 42 B.R. 706 (D.Conn.1984); *In re Smith-*

*field Estates, Inc.,* 52 B.R. 220 (ftnote 5) (Bkrtcy. D.R.I.1985).
   CHAPTER 12:
   *Camino Real Landscape Maintenance Contractors, Inc.* 818 F.2d 1503 (9th Cir.1987) (Treasury Bill + 2% – 1%). *In re Doud,* 74 B.R. 865 (Bkrtcy.S.D.Iowa 1987).

**11.** This is the standard and formula which this Court has, since January of 1987, used in deciding this issue in cases under this Act and which was subsequently memorialized in a Memorandum dated July 28, 1987.

yield for the applicable term of the Treasury Bond, plus a risk factor of —0— to a cap of 3 percentage points.

It is necessary to factor the within risk percentage points because this Court realizes that a Chapter 12 Reorganization is not as risk free as is a Treasury Bill yield or Treasury Bond yield and therefore, these percentage points must be added to meet fairness and equity.

This risk factor can and must, of necessity, be variable in its amount since the amount to be added must, in large measure, depend upon additional factors and considerations which are:

1. The projected disposable income dedicated to unsecured creditors, above the required liquidated value payments during the life of the Plan;

2. The debtors' performance of their duties and requirements during the pendency of this action, including the accuracy of the schedules, the filing of all required reports and the demonstration of good faith;

3. The nature of the collateral;

4. The length and term of repayment;

5. The total amount due and owing, as well as the amount of the periodic payment;

6. Prior history of the debtors including previous Bankruptcy filings and pre-petition payments on their obligations;

7. The recommendation of the Trustee at hearing on confirmation, after an in-depth analysis and feasibility study has been acomplished, pursuant to his or her duties.

8. And such other factors as may be peculiar in each individual case.

Given the above formula and applying it to the facts in this case, the Court first determines that the 20-year U.S. Treasury Bond rate is the appropriate index from which to start. The 20-year bond yield as of this date is 8.46%. The Court then must look to the risk factor involved. In so doing the Court considers the payment history of the debtors, the cash flow projection set out in their Plan, the vital importance of the debtors to maintain their payments during the life of the Plan, and all of the other factors and considerations heretofore enumerated. Having considered the factors in this cause, the Court concludes that a risk factor rate of 1.04% should be added onto the Treasury Bond rate to equal the appropriate discount rate necessary for determining the present value of the claim.

## ORDER

WHEREFORE, it is ORDERED, ADJUDGED and DECREED as follows:

1. That the value of the subject real estate which secures the Federal Land Bank's debt is One Hundred Forty-one Thousand Four Hundred Dollars ($141,400.00), thereby causing the Federal Land Bank to be an undersecured creditor;

2. That the interest rate to be fixed to the mortgage indebtedness of debtors to Federal Land Bank securing said real estate should be, and hereby is, determined to be 9.5% per annum during the life of this Plan; and

3. That debtors' Plan, as Amended, should be, and the same hereby is, CONFIRMED.