**In re Delbert H. NEFF, Debtor.**

**Bankruptcy No. 2–87–01838.**

United States Bankruptcy Court,
S.D. Ohio, E.D.

June 13, 1988.

Frank M. Pees, Worthington, Ohio, Trustee.

Charles W. Ewing, Columbus, Ohio, for debtor.

William B. Logan, Jr., Columbus, Ohio, for Federal Land Bank.

## ORDER ON OBJECTION TO CONFIRMATION

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court on an objection to confirmation of the Chapter 12 plan proposed by Delbert Neff. The objection, filed on behalf of The Federal Land Bank of Louisville ("Land Bank"), was heard on an abbreviated basis by the Court. Subsequent to that hearing, the parties entered into certain stipulations as to facts, transcripted testimony and other evidence to be placed before the Court concerning the two issues for which resolution had not been reached between the parties. Both parties fully briefed those issues and Land Bank later submitted a supplemental brief.

The Court has jurisdiction in this proceeding under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This contested matter, relating to confirmation of a Chapter 12 plan, is a core proceeding in which this bankruptcy judge may enter a final order. 28 U.S.C. § 157(b)(2)(L).

## PRELIMINARY FACTS

The debtor filed a petition under the provisions of Chapter 12 of the Bankruptcy Code on April 30, 1987. The plan being considered by the Court for possible confirmation is the second amended plan, filed November 10, 1987, and dated September 30, 1987 ("the Plan"). As it affects Land Bank's class B-1 secured claim, the Plan proposes to repay that claim in full by equal annual installments over a period of 30 years with interest at the rate of 10.3%. The Plan further proposes that Land Bank retain its liens on the real properties and class B participation stock (the "Stock") which serve as collateral for its debt. However, the amount of that allowed secured claim does not include $12,400 agreed upon as the value of the Stock. On that basis and on what appears to be an agreement between the parties, the Court concludes that the debtor is proposing to sur-

render the Stock to Land Bank rather than increase Land Bank's allowed secured claim by the value attributed to the Stock. Apparently, the lien retention is proposed only in the alternative should the surrender not be permitted.

Without inclusion of the Stock, the debtor's obligation to Land Bank is secured by first mortgages against four parcels of improved and unimproved agricultural real property. The parties agree that the properties should be valued in the aggregate at $296,500. As prior liens exist for unpaid real estate taxes in the amount of $4,977.41, Land Bank's allowed secured claim is $291,523. No issue was raised relating to hypothetical costs of sale which might impact upon Land Bank's allowed secured claim and, as the amount of such claim is undisputed, the Court assumes no such costs for purposes of this case.

## ISSUES BEFORE THE COURT

Land Bank objected to the Plan on a number of grounds. All have been resolved between the parties except the issues of the appropriate discount factor required to compensate Land Bank for the delay in receiving the value of its collateral and the ability of the debtor to surrender the Stock which serves as additional collateral for the obligations to Land Bank.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. *Surrender of the Stock*

It is conceded that, outside of bankruptcy, a borrower from Land Bank must acquire stock in Land Bank equal in value to at least five percent (5%) of the original loan amount. Presumably, the borrower also must finance the purchase of that stock. 12 U.S.C. § 2034. The purpose for the statutory requirement is to ensure the adequacy of the capitalization of the farm credit system, of which Land Bank is one component.

Land Bank argues that certain provisions of the Farm Credit Act of 1971, codified as 12 U.S.C. § 2001, et. seq. ("Farm Credit

Act"), prevent the debtor from surrendering the Stock which he was required to purchase and finance as part of his loan from Land Bank. Although, pursuant to 12 U.S.C. § 2131(d), Land Bank may retire and cancel a borrower's stock when an obligation is in default, such action is discretionary. An equivalent option to return stock for credit is not granted by statute to a borrower. Land Bank asserts that the exclusion of such right acts as a prohibition of such surrender by a borrower who is also a debtor under Chapter 12 of the Bankruptcy Code.

In its supplemental brief, Land Bank directs the Court's attention to a provision of the recently enacted Agricultural Credit Act of 1987 which requires cancellation of all but one share of a borrower's statutory stock on a dollar for dollar basis equal to the amount of principal forgiven in any restructuring agreement between the borrower and Land Bank. See 12 U.S.C. § 2202(b). Such provision does not specifically refer to Chapter 12 of the Bankruptcy Code, nor, according to Land Bank, does it change the basic concept of Land Bank's capitalization. Land Bank has consented to the application of that provision generally in Chapter 12 cases in this region, subject to the limitation contained in the statute. As the debtor's proposed treatment of Land Bank's claim does not result in the forgiveness of principal, however, 12 U.S.C. § 2202(b) has no application in this particular Chapter 12 case.

The debtor argues that his rights are defined and limited only by the provisions of the Bankruptcy Code which grant him wide latitude in reorganizing his economic life and encourage him to surrender property not necessary for his rehabilitation. The question before the Court then is twofold: is the debtor's proposed surrender of the Stock permissible under the relevant provisions of the Bankruptcy Code, and, if permissible, is the exercise of that power affected or limited by other federal statutes governing Land Bank's operation?

Chapter 12 (11 U.S.C. § 1201 et seq.) was added to the Bankruptcy Code in 1986 in response to what Congress perceived as an economic crisis in the agricultural community. H.R.Conf.Rep. No. 5316, Bankruptcy Judges, U.S. Trustees and Family Farmer Bankruptcy Act of 1986, 132 Cong. Rec. H9001–2 (daily ed. Oct. 2, 1986) (statement of Rep. Synar), 132 Cong. Rec. § 15075 (daily ed. Oct. 3, 1986) (statement of Sen. Thurmond). The remedy was specifically intended for smaller farming businesses owned and operated primarily by families. The chapter was modeled largely after the provisions of Chapter 13 for individuals with regular income, although it also contains an expanded ability to sell property of the estate free and clear of liens. See 11 U.S.C. § 1206.

Provisions which must be included in a Chapter 12 plan are set forth in 11 U.S.C. § 1222(a). In addition, a plan may include a variety of optional provisions suggested by subsections 1–10 of § 1222(b) and may include other appropriate provisions which are consistent with the requirements of title 11. 11 U.S.C. § 1222(b)(11). While plan provisions proposed pursuant to § 1222(b) must meet all requirements for confirmation in 11 U.S.C. § 1225(a), the scope of the optional provisions is broad and is intended to give the debtor maximum flexibility in dealing with his creditors and restructuring his financial life. The optional provisions include the power to modify the rights of holders of secured claims (§ 1222(b)(2)), to pay all or part of a claim from property of the estate (§ 1222(b)(7)), and to distribute all or any part of property of the estate among those having an interest in such property (§ 1222(b)(8)).

Thus, the debtor is limited in his use of the optional provisions of 11 U.S.C. § 1222(b) only by the mandate for consistency with other provisions of title 11, including the relevant confirmation requirements. As Land Bank has rejected the debtor's proposed plan, those confirmation standards prescribe that Land Bank either retain its lien and receive value equal to the amount of its secured claim with an appropriate discount rate for the payment over time or receive the property securing its allowed secured claim by surrender from the debtor. 11 U.S.C. § 1225(a)(5)(B) and

(C). No other qualifications or restrictions relevant to this case are placed upon the debtor's right to extend the repayment terms of his contract with Land Bank or to surrender all or part of Land Bank's collateral. Therefore, the Court finds that the provisions of §§ 1222(b) and 1225(a)(5)(C) clearly empower the debtor to surrender the Stock to Land Bank and thereby decrease Land Bank's allowed secured claim.

Having determined that the Bankruptcy Code permits and empowers the debtor to surrender the Stock, the issue remaining is whether the Farm Credit Act, which appears to grant discretion for surrender of the Stock only to the lending institution, acts to limit the exercise of powers granted to the debtor by the provisions of Chapter 12.

The Supreme Court of the United States considered the impact of other federal statutes upon rights granted to a debtor under the Bankruptcy Code in *National Labor Relations Board v. Bildisco (In re Bildisco)*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The Court held that a debtor in possession's right to unilaterally reject a collective bargaining agreement was not limited by restrictions upon such action embodied in the National Labor Relations Act ("NLRA") at 29 U.S.C. § 158(a)(5) and § 158(a)(1). Where no specific exception existed in § 365 of the Bankruptcy Code for contracts governed by the NLRA, the Court found that such agreements could be rejected by a debtor in possession if the agreements burden the estate and, after careful scrutiny, the equities favor rejection. *Bildisco*, at 522–523, 525–526, 104 S.Ct. at 1194–1195, 1195–1196. Although Bildisco, as an employer, remained subject to the NLRA, specific provisions in that Act which impeded its reorganization effort would not be effective or enforced in the bankruptcy setting without specifc statutory indication in the Bankruptcy Code that Congress intended such effect. *Bildisco*, at 532–533, 104 S.Ct. at 1199–1200. Subsequent to that decision, certain statutory limitations on the rejection ability were added to the Bankruptcy Code as 11 U.S.C. § 1113.

The requirements of the Farm Credit Act being asserted as a sword by Land Bank, while analogous to those in the NLRA considered in *Bildisco*, are substantially more tentative. Despite powers granted by specific provisions of Chapter 12 of the Bankruptcy Code, Land Bank asks that the provision in its governing statute, which omits any option for stock redemption by a borrower and includes such rights only for the lender, be interpreted by this Court as barring the debtor from surrendering the Stock to Land Bank and thereby diminishing Land Bank's allowed secured claim.

■ This Court finds that Land Bank is incorrect in its assertion. The cited provision in the Farm Credit Act is an enabling one directed solely at the operations of farm credit entities in the normal course of business. Nothing in that statute or any relevant legislative history indicates, insofar as the Court is aware, that the provision has any application in bankruptcy. Indeed, given the *Bildisco* holding, legislative intent to override rights granted by the Bankruptcy Code would have to be express and precise. This Court agrees with other courts considering this issue which have concluded that a Chapter 12 debtor may elect, under the provisions of the Bankruptcy Code, to surrender statutory stock to Land Bank and eliminate the portion of Land Bank's allowed secured claim representing value given to the Stock. See *In re Massengill*, 73 B.R. 1008 (Bankr.E.D.N.C. 1987); *In the Matter of Bollinger*, No. 3–86–01041 (Bankr.S.D. Ohio 1987) (unpublished opinion of Clark, B.J.); *In the Matter of Fields*, No. 3–87–01539 (Bankr.S.D. Ohio 1988) (unpublished opinion of Waldron, B.J.). Accordingly, Land Bank's objection to the debtor's surrender of the Stock is overruled.

### B. *The Interest Rate Issue*

The other issue raised by Land Bank is the appropriateness and adequacy of the interest rate of 10.3% proposed by the debtor as compensation to Land Bank for the payment of its allowed secured claim over time. In the briefs submitted to the Court, the debtor further suggested that the ap-

propriate rate was either 1% over the sale price of 52 week treasury bills or 1% over the creditor's cost of capital. Neither of those rates is specifically included in the Plan. Therefore, those rates are relevant only to the extent the calculations used to produce them also result in the 10.3% factor proposed in the Plan.

Although expressed as an interest rate, the discount factor required by 11 U.S.C. § 1225(a)(5)(B)(ii) represents compensation for the decreased value the creditor receives by the passage of time between confirmation and its receipt of the value of its collateral. That decrease occurs because of projected inflation and the creditor's inability to repossess its collateral immediately upon confirmation and reinvest the proceeds from liquidation of that interest. The addition of a discount factor thus satisfies the requirement in 11 U.S.C. § 1225(a)(5) that "the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim;" See *United Savings Assoc. v. Timbers of Inwood Forest Assoc., Ltd.,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Land Bank maintains that the proper discount factor to be applied to its claim is the current adjustable interest rate of 12.5% used for Land Bank's class C borrowers. That result is premised either upon a recognition that Land Bank's interest rate structure governs as a matter of law, or upon a factual finding by the Court that Land Bank's rate is the current market rate for loans of this type.

1. Use of Land Bank's Rate as a Matter of Law.

■ Land Bank's claim that its interest rate structure determines the discount factor the debtor must propose as a matter of law is based upon language in 12 U.S.C. § 2205 which provides that "[i]nterest rate limitations imposed by any state constitution or statute or other laws are hereby pre-empted for purposes of this chapter." The problem with that position, however, is that the Bankruptcy Code is not a statute which imposes a limitation on interest rates. The provision in the Farm Credit Act was intended to enable Land Bank to establish national rates for interest charges for its loans without sensitivity to various state usury laws. Even if the intent of the provision extends beyond that, this Court believes Congressional policies encouraging financial rehabilitation, which underlie the reorganization chapters of the Bankruptcy Code and were codified after the passage of the Farm Credit Act, require application of bankruptcy law standards.

In addition, the issue before the Court relates only to the duty of a debtor in bankruptcy to provide the present value of a creditor's allowed secured claim by the use of a discount factor. The issue does not relate to an interest rate being set by Land Bank pursuant to a chapter of the Farm Credit Act. Although the statute cited by Land Bank may protect it from outside direction when it sets interest rates for its loans, that statute does not bind the judicial system in interpreting the legal standard required for payment of allowed secured claims in a reorganization process. Payment of an allowed secured claim to Land Bank is not a loan initiated or agreed to by Land Bank, but rather is an involuntary loan mandated by the bankruptcy laws.

■ This issue was recently considered by Bankruptcy Judge Kearns, who observed:

"... the specific language of 11 U.S.C. 1201 et seq. clearly gives this Court the authority, as well as the mandate, to determine the present value of the secured portion of a creditor's claim, whether the creditor be the Federal Land Bank or any other secured claim holder.

The mandate given the United States Bankruptcy Court by 11 U.S.C. 1201 et seq. is fundamental in that the Court must have the authority to consider an interest rate factor in deciding future payments to a farm plan creditor so as ... to ensure for the creditor that future payments proposed under the Plan will

be equal to the present value of secured creditor's collateral.

> .   .   .   .   .

> ... This Court finds that Title 12 U.S.C. 2015 may well control the operation of the Federal Land Banks throughout the nation, but in light of this new farm Bankruptcy legislation, it does not control the U.S. Courts, and consequently, said statute is inapplicable as forming the basis of an objection to a debtor's proposed Plan under Chapter 12 of the Bankruptcy Code."

*In re Caudill,* 82 B.R. 969, 974–975 (Bankr.S.D.Ind.1988).

This Court agrees with the *Caudill* Court and finds, as a matter of law, that Land Bank's internal rate structure does not determine the discount factor a debtor must propose pursuant to 11 U.S.C. § 1225(a)(5)(B)(ii).

2.  Determination of the Market Rate as a Matter of Fact

Finally, Land Bank argues, if its internal rate is not mandated as a discount factor as a matter of law, then its interest rate is, as a matter of fact, the same as the current market rate of interest which must be applied to this involuntary loan.

It is undisputed that the standard in this circuit for discount rates used to establish the present value of allowed secured claims repaid over time in reorganization settings is "in the absence of special circumstances ... the current market rate of interest used for similar loans in the region." *Memphis Bank & Trust Company v. Whitman (In re Whitman),* 692 F.2d 427, 431 (6th Cir.1982). It is not clear, however, how such rate is calculated.

The Court has reviewed extensively cases determining discount factors for various reorganization chapter proceedings. Those decisions, of necessity, are based upon facts presented in given cases and, by their nature, yield only an approximate result. Those cases focusing on current market rates of interest result variously in adoption of the contract rate, calculation of a rate determined exclusively from evidence and testimony in a given case, use of

a guide to determine the risk-free cost of funds with judicial additions for various other considerations, or a rate obtained by application of a combination of those results. See *In re Neff,* 60 B.R. 448 (Bankr. N.D.Tex.1985), *aff'd, SBA v. Neff,* 785 F.2d 1033 (5th Cir.1986) (contract rate); *In re O'Farrell,* 74 B.R. 421 (Bankr.N.D.Fla. 1987) (average of testimonial rates); *In re Paddock,* 81 B.R. 51 (Bankr.D.Mont.1987) (prime rate plus 1½%); *In the Matter of Doud,* 74 B.R. 865 (Bankr.S.D. Iowa 1987) (treasury bond rate plus 2%). Each of those approaches has been considered by this Court.

(a) *The Contract Rate*

■   The Court finds that the historic or existing contract rate, standing alone, is not an appropriate measure of the discount factor to be used. First, the Court believes that Chapter 12 was intended to give a debtor broad powers to affect secured claims in a manner analogous to provisions under Chapter XII of the now-repealed Bankruptcy Act of 1898 and was not an attempt to incorporate the limitations of cramdown under Chapter 11 of the Bankruptcy Code. Such powers include the ability to adjust outdated interest rates to reflect more accurately current market rates. "An Analysis of Pending Bills to Provide Family Farm Debtor Relief Under the Bankruptcy Code", Floor Statements on H.R. 5316, 132 Cong.Rec. S15080 (1986) (statement of John C. Anderson). That legislative intent eliminates the existing contract rate as a definitive measure, although further analysis in a particular case might indicate its continued viability.

■   The Court also finds that the prospective contract rate of the Lender, standing alone, does not conclusively establish a market rate of interest. Lenders may have rates which are higher than the average rate because of unusually large loans in default, bad management decisions not characteristic of the market segment generally or specific requirements in a lender's charter. If evidence establishes that the lender's base rate is higher than that of other lenders active in the same general

geographic area with similar collateral, that inflated rate should not be found to be the market rate. To hold otherwise would greatly limit a debtor's ability to reorganize and would permit his past errors to prejudice his future prospects and perpetuate his financial inferiority. That finding is consistent with Chapter 13 case law in this circuit which holds that the market rate of interest for secured claims cannot exceed the existing contract rate. *Cardinal Federal Sav. & Loan Assoc. v. Colegrove (In re Colegrove)*, 771 F.2d 119 (6th Cir.1985).

The testimony in this case indicated that Land Bank's rates currently are somewhat higher than the "going rates." This results from inclusion in the base rate calculation of older long-term bonds which were sold when interest rates were significantly higher than present rates. The higher rates may also result from the highly specialized nature of Land Bank's lendings which make it especially vulnerable to problems in the agricultural sector of the economy. Whatever the reason, those higher rates will not be imposed automatically upon debtors in farm business reorganization cases. Accordingly, the Court will not presume that the market rate is established by historic, existing or prospective contract rates.

### (b) *The Testimonial Rate*

The market rate issue before the Court for decision in this case was submitted on the briefs of the parties and on excerpts of testimony received in early fall of 1987 in a Chapter 12 case before another judge of this Court. That testimony established that Land Bank, a lender generally secured by mortgages against agricultural real property, has primarily two types of loan programs. One is a variable rate program under which one interest rate is offered to all eligible borrowers, based upon the long-term or average cost of all outstanding bonds funding the program plus certain additions. That average cost was approximately 11.60% in September 1987. An additional 0–1.5% is added to that cost figure to compensate Land Bank for certain operating costs and risk allocations.

The other program, known as the individual loan program, bases its rates primarily upon the cost of all outstanding short-term, one-year farm credit bonds issued under Land Bank's variable program. The bonds from which the cost factor is derived may include bonds in default issued over several years. To that short-term cost, at 6.9% in September 1987, up to 3.85% is added for operating costs to establish the base rate for the most desirable borrower. Risk factors are then added for various categories of borrowers. For the highest risk category, into which Land Bank now places this debtor, the adjustable or variable interest rate is 12.5%. That rate is .25% to .6% higher for a fixed rate loan. Eligibility for obtaining a loan in that risk category of this program primarily is based upon qualification as a farmer.

It is admitted that interest rates charged by Land Bank to borrowers under the variable rate individual pricing program, at least to the extent such rates are based upon the long-term price of bonds, lag the market rate in a declining market because some unusually high long-term bond rates are averaged into that process. Testimony received from the debtor's expert further indicated an awareness of interest rates for agricultural real estate lenders ranging from a variable rate of 9.5% to a fixed rate of 11.25% for a loan amortized over a 30–year period with a ten-year call, based upon lending up to 60% of the appraised value of the real property securing the loans. In that expert's opinion, the range of current market rates for variable rate loans was 8.75% to 10.5% with the current market rate being 9.5% to 9.75%. That opinion, however, did not consider down payment requirements, the effect of a residence on the property or any variation in the financial qualifications of the borrowers. As might have been expected, the testimony established that Land Bank's rates for this debtor of 12.5% to 13.1% are too high and the debtor's expert's rates of 9.5% to 9.75% are too low. An average testimonial rate, considering the limitations and biases of each witness' testimony, would be approximately 11%.

The difficulty with adopting the testimonial rate is that it can cause wide variation in rates for similarly situated debtors and may encourage litigation of matters which arise in all Chapter 11, 12 and 13 cases. It may also cause the Court's decision to be unusually sensitive to a party's ability to retain and present a persuasive expert witness and may not be consistent with the vision of the process set forth in this circuit in *Memphis Bank.* 692 F.2d at 431. Such testimony is helpful, however, insofar as it serves to inform the Court of relevant details of a lender's business or particular attributes of a debtor.

The Court has determined to establish guidelines which will apply generally in Chapter 12 and 13 farm cases and will not require each such dispute to be actually tried. Therefore, the Court finds that testimonial evidence, while part of its consideration, will not be the sole measure of the rate to be used in a particular case. See *In the Matter of Wichmann,* 77 B.R. 718 (Bankr.D.Neb.1987).

(c) *The Rate Based Upon Treasury Bonds or Bills Plus Increases for Risk Factors*

It is certainly appealing to adopt an independent objective standard by which market rates may be predetermined by parties in bankruptcy cases with resort to testimony only in unusual or special circumstances. Most commonly, that approach has resulted in the adoption of a risk-free component of the rate derived from the current United States treasury bill or bond rates with certain adjustments to reflect the Chapter 12 plan's actual amortization of the secured claim. To that resulting rate courts have added a uniform percentage for the risk component. See *Wichmann,* 77 B.R. at 718; *Doud,* 74 B.R. at 865; and Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate,* 32 S.D.L.Rev. 42, 59–60 (1987).

The problem with such an approach is that it does not permit sufficient latitude for consideration of unusual factual circumstances present in particular cases and

is not specific for a particular market segment. Further, because the added component initially must be determined by the Court, adoption of this procedure requires the judiciary to ascribe rate increments for future risks to debtors and collateral and to forecast other events with a precision which this Court doubts its ability to accurately assess. Expressed in another fashion, for this Court the element of subjectivity in the second step of that approach is unacceptably high.

(d) *Objective Determinants in Conjunction with Testimony*

A particularly objective and probative measure brought to the Court's attention in this case was the Federal Reserve Bank's Quarterly Survey of Agricultural Credit Conditions at Commercial Banks (the "Survey"). The Survey set forth the most common interest rates for specific geographic locations, further classified by the type of collateral and the length of the loan. Specifically, the Survey displays the most common interest rates in various Federal Reserve Bank districts for long-term real estate loans from commercial banks which have significant lending in the agricultural market. Of the various approaches used, the averages set forth in the Survey best comported with the Court's independent perception of current market rates generally.

Based upon the foregoing, the Court finds that, where the secured claim is based upon an agricultural rather than a consumer loan, the proper discount factor to be used to produce the present value of the allowed secured claim which must be paid through the debtor's Plan is the rate established by the Survey, updated to one or two quarters prior to confirmation, along with testimony relating to unusual more recent trends in interest rates, relevant subsidies for the lender or compelling characteristics of the particular debtor or security. Such compelling characteristics might include multiple bankruptcy reorganization attempts, lack of good faith in dealing with the creditor, unusual risk to the value of the real property securing the loan, lack of insurance, or other factors especially relevant to a particular case.

■ Because the Court has determined to use data from the Survey and because the Survey presented to the Court in this case displayed interest rates current only through the first quarter of 1987 and did not portray data for the Federal Reserve District which includes Ohio, the Court is unable to find that the discount factor of 10.3% proposed by the debtor meets the test for confirmation set forth in 11 U.S.C. § 1225(a)(5)(B).

Consistent with the foregoing, Land Bank's objection to confirmation is overruled on the stock surrender issue and is sustained on the interest rate issue. Accordingly, confirmation of the debtors' plan must be, and the same is, hereby DENIED. The debtor is given twenty (20) days to amend his plan to propose a rate which reflects the Court's findings and to serve such amended plan upon Land Bank. If data is not available for this Federal Reserve district, a blend of the rates shown for the Seventh and Fifth Federal Reserve Districts may be proposed along with considerations received by testimony. If no such amendment is proposed, the Court will dismiss this case.

If an appropriately amended plan is filed, either the debtor or Land Bank may request a short hearing to present testimony consistent with the findings in this opinion. Such hearing will not be required, however, solely to make the Court aware that this loan is more highly leveraged than an average loan or that the debtor had at least a recent history of default. In the Court's opinion, those factors are balanced by the relative security of the creditor's collateral and by the significant decrease in the debtor's payment obligations which will result from confirmation of the Chapter 12 plan. The loan will be measured against other long-term loans to farm debtors in this geographic area secured by mortgages against real property. In that sense, the debtor's presence in Chapter 12 will not require a specific adjustment in the loan rate.

IT IS SO ORDERED.